Ex Parte HILL, in Re WILLIS, JOHNSON, and REYNOLDS, *vs.* CONFEDERATE STATES.

[APPLICATION FOR PROHIBITION TO PROBATE JUDGE.]

1. *Jurisdiction of State courts to discharge enrolled conscript from custody of Confederate States officer.*—The courts and judicial officers of the State have no jurisdiction, on *habeas corpus*, to discharge from the custody of an enrolling officer of the Confederate States, on the ground of physical incapacity for military service, persons who have been enrolled as conscripts under the several acts of congress.

2. *When prohibition lies.*—Where a probate judge has granted the writ of *habeas corpus* to an enrolled conscript, whose petition for the writ shows on its face that said judge has no jurisdiction to inquire into the validity of his enrollment, a prohibition will be awarded by the supreme court, without a previous application to the circuit court, enjoining further proceedings by the probate judge ; and the application for the writ may be made by the enrolling officer who has the custody of the conscript.

3. *Constitutionality of conscript laws.*—The several acts of congress, commonly called the " conscript laws," (C. S. Statutes at Large of 1st Congress, 1st session, p. 29 ; *ib.* 2d session, p. 61,) are constitutional. (*Per* STONE, J.)

APPLICATION by L. H. Hill, an officer in the provisional army of the Confederate States, and the enrolling officer of the district including the county of Montgomery, for writs

of prohibition, to be directed to the probate judge of said county, enjoining and restraining him from further proceedings in the matter of the petitions of Asa J. Willis, E. P. Johnson, and Calvin Reynolds, respectively, for the writ of *habeas corpus*, by which said petitioners sought to obtain their discharge from the custody of said enrolling officer.

The application was made on a regular motion day, during the January term, 1863; present, Hon. A. J. WALKER, C. J., and STONE, J. The opinion of Chief-Justice WALKER was pronounced on the 4th March, 1863, and an opinion was pronounced by Justice STONE a few days afterwards; but the latter opinion was subsequently withdrawn, and that herewith published was substituted in its stead.

The case was argued at the bar, by P. T. SAYRE, on behalf of the Confederate States, and by S. F. RICE and JNO. A. ELMORE, with whom was A. B. CLITHERALL, for the petitioners in the court below. No brief or memorandum of their arguments has come to the hands of the Reporter.

A. J. WALKER, C. J.—Three persons, who were taken and detained in custody under the conscript law by the enrolling officer, severally petitioned the probate judge for writs of *habeas corpus*, predicating their prayers for a discharge upon the ground of exemption from conscription on account of physical disability; and the writs were awarded by that officer. The enrolling officer, contending that the judicial tribunals of the State have no jurisdiction over the matter of his detention of those persons as conscripts, now applies to this court for writs of prohibition. Thus the duty devolves upon this court, of deciding whether a State tribunal has authority to discharge one who has been taken and is detained by the enrolling officer as a conscript, upon the ground of his exemption for the reasons above stated.

The first section of the act of congress, approved April 16, 1862, authorizes the president to call out and place in the service of the Confederate States men between the ages of

eighteen and thirty-five years, who were not legally exempted from military service.    The amendatory act of the 27th September, 1862, in language similar to that employed in the original law, extends the authority to men between the ages of thirty-five and forty-five; and requires the president, if he should not call out all the persons between the specified ages, to discriminate, by limiting his call to persons of some particular age under forty-five.    By an act approved 21st April, 1862, certain descriptions of persons were exempted from enrollment for service in the armies of the Confederate States.    That act was repealed by one adopted on the 11th October, 1862, which exempts "from military service in the armies of the Confederate States" various classes of persons therein described.

The two acts of 16th April and 27th September impose upon the authority to conscribe a restriction to persons not legally exempted.    The persons exempt are not described by name, but by classes, defined by reference to bodily or mental incapacity, to the incumbency of certain offices, the practice of certain useful arts, the profession of some specified religious creeds, and other distinguishing peculiarities.    As the authority to conscribe does not extend to the individuals who compose those classes, it can only be exercised by ascertaining the persons to whom the peculiarities distinguishing the different classes pertain.    The ascertainment of the legal subjects of conscription is an unavoidable step in the proceeding.    Inquiry and decision, upon this point, are necessarily involved in the exercise of the president's power to conscribe all within the prescribed ages, "who are not legally exempted from military service."

The selection from the community at large of the subjects of conscription, involving inquiry and decision as to the *status* of every man, was obviously susceptible of accomplishment by the executive department of the government, only through the agency of officers clothed with the requisite authority.    Congress therefore has authorized the appointment of such officers.    By the third section of the act of 16th April, 1862, the president is empowered to ap-

point officers, charged with the duty of enrolling conscripts, "*in accordance with rules and regulations to be prescribed by him.*" A later act, approved 8th October, 1862, directs, that enrollments shall be made *under instructions from the war department,* and reported by the enrolling officer. Furthermore, an act, approved October 11th, 1862, authorizes the assignment of one or more surgeons to the duty of examining those enrolled; and declares, that the decision of such surgeon or surgeons, "*under regulations to be established by the secretary of war*," as to physical and mental capacity, *shall be final.*

The employment of appropriate officers to execute the conscript law, is thus clearly authorized. Every act of conscription by such officers must be done pursuant to a decision based upon an inquiry, in which the hearing and weighing of evidence must often, if not always, be necessary. Without an inquiry and judgment as to the liability to conscription, no enrollment could be made, because it could not otherwise be determined who were subject to conscription. This authority to inquire and decide is not, however, left to implication from the nature of the act. There is an express authority to decide upon the question of exemption on account of mental or physical incapacity, and the decision of the tribunal designated is made final. The existence of such authority is clearly indicated in the phraseology of the law, declaring that "all persons who *shall be held unfit* for military service in the field, by reason of bodily or mental incapacity, under the rules to be prescribed by the secretary of war," shall be exempt. The *holding* or deciding persons to be unfit for military service, under rules prescribed by the secretary of war, must be by the officers appointed to execute the law. The authority to hear evidence and decide, is a plain inference from the provision in the act of 11th October, 1862, that the claim of certain classes of artisans is to be supported by affidavit, which shall only be *prima-facie* evidence of the facts stated. Furthermore, the general idea, that the power of investigation and decision is a part of

the authority to be exercised by the respective officers, is very clearly brought to view in the clause of the same act, which requires the secretary of war, upon evidence, to judge whether the exempted artisans have, by their conduct, forfeited the privilege. It must be noted, too, that the duties of the officers are to be discharged under rules and regulations to be prescribed by the secretary of war. Surely, these rules and regulations are not contemplated to be merely the guides of the subordinate officers, in performing the acts of writing down the names of the conscripts, and taking charge of them. They were destined to control and direct them in the higher, more important, and more difficult office of inquiring and judging as to the liability to conscription. The execution of the law is utterly impracticable, if there be no authority to ascertain and judge who are the legal subjects of conscription. With the utmost confidence, I assert the proposition, that the officers employed in the execution of the law are clothed with authority to judge what persons fall within its operation. The exercise of this authority is an official duty, to be performed under the guidance of rules prescribed by the secretary of war.

A State judge, in discharging one taken as a conscript, upon the ground that he was not legally liable to conscription, would supervise and control an officer of the Confederate States, in the performance of an official duty, and in the exercise of a legal authority. He would, furthermore, annul the decision which such officer was authorized to make, and abrogate the enrollment based upon that decision. The decision of the question of amenability to conscription is within the scope of the authority exercised. An incorrect decision would be an erroneous exercise of a subsisting authority—not a mere usurpation. The officer is perfectly within the limit of his authority, when he investigates and decides; and, though he may err, he is not an usurper. Neither the absolute invalidity of the conscription, nor a liability in trespass, would result from an incorrect decision.—*Duckworth v. Johnson*, 7 Ala. 578;

*Savacool v. Boughton,* 5 Wend. 170; *Easton v. Calender,* 11 *ib.* 90.

The principle is illustrated in the case of a justice, erring in the exercise of his authority to commit offenders; and of assessors, who incorrectly decide that a given person belongs to a class liable to be taxed. The levy of a *fieri facias* by a marshal of the Confederate States, upon property not belonging to the defendant, does not present an analogous question. He is simply authorized by the process to do a particular thing. He is not called upon by the law to decide anything. He has none of the attributes of a tribunal armed with authority to investigate and decide questions. His judgment, of course, he exercises, in determining whether the property upon which he levies belongs to the defendant; but, upon a principle of public policy, he decides at his own peril. The exercise of his judgment is for his own protection, and not by authority of law. His process authorizes him to levy upon the defendant's property—not to adjudge the question of the title to property. It neither requires him to construe a law, nor to decide upon evidence as to the cases that come within its operation. The law under which he acts, and which governs him, unlike that under which the enrolling officer acts, has not deemed it necessary to bestow authority for an investigation and *quasi*-judicial decision, preliminary to his action; but, in requiring him to act at his own personal peril, has expressly repudiated such an idea. No act of congress prescribing a marshal's authority, nor any construction thereof, can be drawn in question in a suit against him, for the levy of process against one, upon the property of another. The simple inquiry, in such a suit, would be, whether the particular chattel, under the general law governing property, belonged to the one person or the other; while at every step in the cases now before us, the court must expound the act of congress marking out the authority of the officer. The decisions, therefore, as to the power of the State courts over the United States marshals, erring in the execution of their process, have no bearing

upon the question before us. The same distinction applies to an arrest of one person, by virtue of process against another.—*Bruen v. Ogden*, 6 Hals. 370; *Dunn v. Vail*, 7 Mar. La. 416; *Slocum v. Mayberry*, 2 Wheaton, 1.

The officer charged with the execution of the conscript law, not only has authority to investigate and decide, but he is required to do so according to regulations prescribed by the secretary of war. The question of these cases, then, is narrowed down to this : can a State judge, by writ of *habeas corpus*, supervise, control, and annul the act of officers of the Confederate States, done in the exercise of authority given by the law of that government, and required to be done under regulations prescribed by the secretary of war ?

It is proper to approach the interesting question above stated, by an observation in reference to the relation existing between the government of the Confederacy and the government of the several States which compose it. The government of the Confederacy possesses the powers delegated by the constitution ; and the States retain their original powers, except so far as they may be affected by the grants or prohibitions of the constitution of the Confederate States. While the Confederate government exists by virtue of delegated authority, its powers, within their appropriate boundary, are not subordinate to those of the States. On the contrary, it is expressly declared in the constitution, that the constitution, and the laws of the Confederate States made in pursuance thereof, and all treaties made under the authority of the Confederate States, shall be the supreme law of the land. The authority of all governments must be exercised, and must reach the subjects of its operation, through the agency of officers. The officers of the Confederate States, and of the several States, must exercise their functions, and apply the authority of their respective governments, within the same territorial area. It is the clearest deduction of reason, that the officers of neither of these distinct powers, operating within the same territorial limits, and performing proper functions,

can be subordinated to the other, except as authorized by the constitution, without detriment to the harmonious working of our complicated system, and peril to the rights and benefits which that system was designed to secure.

The analogy (in all respects which concern our subject) between our government and that of the United States enables me to draw from the history of the past an illustration of the idea which I am striving to develop. The fugitive-slave law was passed to protect and maintain a clear constitutional right of a class of citizens in the United States, whom the fluctuations of time had localized in less than a moiety of the States. In most of the other States, an antagonism of sentiment to that right gradually intensified into fanaticism, and extended to the persons to whom the right appertained. A right of subordinating the authority of the officers deputed to execute that law, to the control of local State tribunals, infected by the feeling prevalent in those States, was asserted and maintained.— In many localities, the execution of the law was, by this means, prevented; and the just claim of the people of the slaveholding States, to the maintenance of a constitutional right, was defeated. The powers of the Confederate government are given to it for the benefit and protection of all the people in all the States; and the historic lesson teaches us, that the execution of the laws, passed by virtue of those powers, can not be safely left to the control of local tribunals. The absence of the danger, under our system, can only be argued by arrogating to ourselves a freedom from the frailties of human nature.

The supreme court of the United States, faithful to the constitution, while every other branch of the government seemed to conspire its overthrow, through its venerable and illustrious chief-justice, announced an opinion upon the assumption by the court of Wisconsin of the authority to thwart the execution of the fugive-slave law in that State. The case was *Ableman v. Booth*, and *The United States v. Booth*, reported in 21 Howard, 506. The entire opinion seems to have had the approval of each one of the nine

judges composing the court; which was rarely the case, where questions of constitutional law were presented. In that opinion it is said : "The powers of the general government, and of the State, although both exist, and are exercised, within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge, or a State court, as if the line of division was traced by landmarks and monuments visible to the eye." In this extract, and in other parts of the opinion, the proposition is maintained, that neither government can pass the line of division between their respective powers; and the court further asserts, that the United States marshal, after legally showing his authority to the State tribunal, would be bound to resist its further interference. The practical effect of the law, as declared in that case, is, that a State court or officer has no right of control over the conduct of the officers of the general government, in the exercise of an authority bestowed by its law.

Nor was this principle, when announced in the case above named, at all new in the jurisprudence of the United States. I avail myself of Chancellor Kent's condensation of the decisions upon that subject, and of the authority of his great name, in behalf of my argument, in the following extract from his Commentaries: "*No State can control the exercise of any authority under the Federal government.* The State legislatures can not annul the judgments, nor determine the extent of the jurisdiction, of the courts of the Union. This was attempted by the legislature of Pennsylvania, and declared to be inoperative and void by the supreme court of the United States, in the case of *The United States v. Peters*, 5 Cranch, 115. * * * * * It has also been adjudged, that no State court has authority or jurisdiction to enjoin a judgment of the circuit court of the United States, or to stay proceedings under it. This was attempted by a State court in Kentucky, and declared to

be of no validity by the supreme court of the United States, in *McKim v. Voorhies*, 7 Cranch, 279. No State tribunal can interfere with seizures of property, made by revenue officers under the laws of the United States ; nor interrupt, by process of replevin, injunction, or otherwise, the exercise of the authority of the Federal officers ; and any intervention of State authority, for that purpose, is unlawful. This was so declared by the supreme court, in *Slocum v. Mayberry*, 2 Wheat. 1. Nor can a State court issue a *mandamus* to an officer of the United States. This decision was made in the case of *McClung v. Silliman*, 6 Wheat. 598 ; and it arose in consequence of the supreme court in Ohio sustaining a jurisdiction over the register of the land-office of the United States, in respect to his ministerial acts as register, and claiming a right to award a *mandamus* to that officer, to compel him to issue a final certificate of purchase. The principle declared by the supreme court was, that the official conduct of an officer of the government of the United States can only be controlled by the power that created him. If the officer of the United States who seizes, or the court which awards the process to seize, has jurisdiction of the subject-matter, then the inquiry into the validity of the seizure belongs exclusively to the Federal courts. But, if there be no jurisdiction in the instance in which it is asserted,—as if a marshal of the United States, under an execution in favor of the United States, against A, should seize the person or property of B,—then the State courts have jurisdiction to protect the person and property so illegally invaded ; and it is to be observed, that the jurisdiction of the State court in Rhode Island was admitted by the supreme court of the United States, in *Slocum v. Mayberry*, upon that very ground."—1 Kent's Com. 409–10–11. See, also, *McNut v. Bland*, 2 How. 17.

As the officers authorized to execute the conscript law, have jurisdiction to examine evidence, and decide upon the question of amenability to conscription, the authority of Chancellor Kent, as exhibited in the foregoing extract, is

wholly opposed to the jurisdiction claimed for the probate judge in these cases.    Judge McLean, of the supreme court of the United States, holding a circuit court in Indiana, in a charge to a jury trying a case wherein a master sought to recover damages for the taking of his slaves from his custody under a *habeas corpus* issued by a Michigan court, held, that a State tribunal could not release from custody persons held under the authority of the United States, and procured from the jury a verdict for the full measure of the master's damages.—*Norris v. Newton*, 6 McLean, 92.    Judge Nelson, of the supreme court of the United States, in a charge to the grand jury, maintained the same doctrine in 1851.— Hurd on Habeas Corpus, 198.  Judge Cheves, of South Carolina, in a learned opinion reported in the 12th vol. Niles' Register, declined to take jurisdiction over the matter of the discharge of one imprisoned under process issued by the authority of the United States ; and the recorder at Charleston has recently followed the principle of that decision, in refusing to interfere under a writ of *habeas corpus* with the detention in the army of an infant only sixteen years of age ; maintaining, that the precedent set by Judge Cheves has since been acquiesced in as a correct exposition of the law in South Carolina.—Ex parte *Rhodes*, 12 Niles' R. 264 ; *In the matter of Benjamin Sauls*, Charleston Courier of 20th October, 1862.    In the State of New York, speaking for himself, and not as the organ of the court, Chancellor Kent laid down the principle more recently asserted in the case of *Ableman v. Booth*.—Ex parte *Ferguson*, 9 Johns. 239.    It appears, however, that this opinion never controlled the action of the New York courts ; for they seem to have since exercised the controverted jurisdiction.—Ex parte *Stacy*, 10 Johns. 328 ; *Carlton's case* 7 Cow. 471 ; *United States v. Wygnall*, 5 Hill, 16.

There are several decisions by State courts, which hold that they have power to discharge persons improperly imprisoned under the authority of the United States, or even under its process.—*Almeida's case*, 12 Niles' Reg. 415 ; *Rockington's case*, 5 Hall's Law Journal, 301 ; *Common-*

wealth v. Fox, 7 Barr, 336 ; State v. Dimick, 12 N. H. 194 ; Commonwealth v. Harrison, 11 Mass. 63 ; The State v. Brearly, 2 South. 555. Several of these cases pertain to the question of the discharge of soldiers, enlisted during their minority, by contracts which the act of congress declared void. I will not pause to inquire, whether they are not distinguishable from these cases ; for, if analogous, I am not willing to follow them. They were decided before the supreme court of the United States made its decision in Ableman v. Booth, herein before noticed. I cannot reconcile with sound principle, or real expediency, the proposition, that an officer of the Confederacy, when engaged in the execution of an act of congress, and acting within the sphere of his authority, can be subject to the control of the judicial tribunals of the States. It is natural that the judicial mind should approach a question which concerns the liberty of the citizen, with a profounder solicitude, and a more sensitive delicacy ; nevertheless, the principle is the same, when the authority of the government touches the property of the citizen, as when it touches his person. And the same doctrine which gives to the State tribunals a power to supervise such official action as concerns the liberty of the citizen, must subject to the arbitrament of the humblest State officer, clothed with judicial authority, the regularity and legality of the acts of all the officers of the government, whose functions reach the property or money of the people. The power of taxation, of collecting the customs, of regulating foreign commerce and commerce between the States, of restoring fugitive slaves, of raising and supporting armies, and all the other powers of government, would be exercised by its officers under its authority, subject to the controlling interference of the local tribunals, within the jurisdiction of which the power should chance to be in process of execution. Authority conferred by all the States, to be exercised by a government in the administration of which all the people and all the States, directly or indirectly, participate, would be admeasured and regulated by the tribunals of particular localities. A

law for the raising of revenue, or of armies, might receive the acquiescence and prompt obedience of a majority of the States ; while a minority, by aid of their courts, utterly thwarted its execution within their limits. Thus a burden, designed to be common, would become partial. And a clash of authority between the States and the Confederate government would lead to disastrous results.

The officers, executing the law of conscription, are required to act under rules given them from the war department. Guided by those rules, the officers may attain a conclusion altogether variant from that which a State judge, either uninformed as to those rules, or not recognizing their obligation upon him, would attain. I presume, that those who argue the subordination of the Confederate officers to the State tribunals, would repudiate the idea of the government of those tribunals by regulations of the war department ; for the argument which maintains a supervisory authority over the subordinate officer would as well apply to his superior. Are we, then, to have an officer, obligated by rules and regulations from the war department, subject to the supervision and control of another, who is not bound to an observance of them ? Are we to have an officer convicted as a usurper, and made amenable to damages as a trespasser, who has acted correctly according to regulations which govern him, but who is to be tried by a tribunal not recognizing them ? These inquiries suggest a very conclusive argument against the assumption of State authority in these cases.

I do not controvert the right of State courts to interpret the constitution, treaties, and laws of the Confederate States, and to treat as nullities all laws infringing the constitution, in cases over which they have jurisdiction. The point of my argument is, that these cases are without the jurisdiction of the probate judge, and he cannot adjudge anything concerning the rights of the parties.

Nor do I controvert the general proposition, that the courts of the States have concurrent jurisdiction over all subjects cognizable in the courts of the Confederate

States, when it is not otherwise provided by law. But I think, that the general rule must be taken with the exception of those cases in which the execution of the laws of the Confederate States by its officers is to be supervised and controlled.

I am not unmindful of the argument *ab inconvenienti*, which has been made. It may be, that access to a judicial officer of the Confederate States would, at present, be inconvenient; but, if so, it is an evil which could easily be avoided, by an act of congress increasing the number of officers, and adjusting their locations with a view to the convenience of the people. The postponement of this duty by congress can not justify us in the abandonment of a principle, or in the setting of a pernicious precedent. Moreover, it must be observed, that the government of the Confederate States has not been so unmindful of the liberty of the citizen, as to leave it to the irrevisable decision of the subordinate enrolling officer. On the contrary, an appeal to the commandant of conscripts, and thence to the secretary of war, is provided by the regulations prescribed for the officers employed in the execution of the law ; and I presume the appeal could be extended to the president himself. I am not prepared to admit, that this succession of officers does not afford a reasonable assurance of the maintenance of justice, right, and law. At least, no one can justly complain that no remedy against an erroneous decision is provided, until he has tested those which the government extends to him. And besides all this, a resort may be had to the judge of the court of the Confederate States. The government of the Confederate States was organized by the States, and its laws have been passed and its officers selected, directly or indirectly, by the States and the people; and it should have the generous confidence and the manly support of the country, in the present struggle for independence and liberty.

If it be true that, at common law, the facts alleged in the return to a *habeas corpus* can not be contested; and if no remedy for that vice in the law had been provided, the

blame would be due to the State government. But in fact, in this State, and in all the other States of the Confederacy, as far as our examination has been extended, there is an express provision for the contestation of the return.—Code, § 3732. If, therefore, a false return should be made, that the petitioner was held by a duly appointed officer by competent authority, it would be the duty of the probate judge to hear a contestation of the return, and not to remand the prisoner if the return was false. In these cases, the petitions themselves, when properly construed, show the want of jurisdiction in the probate judge; and it was his duty to have rejected them *in limine.*—Ex parte *Tobias Watkins,* 3 Peters, 201.

[2.] The cases of Ex parte *Burnett,* 30 Ala. 461, and Ex parte *Smith,* 23 *ib.,* are deemed conclusive authority in favor of the right to apply to this court for a prohibition, without a previous application to an inferior court. The probate judge, in granting the *habeas corpus* upon the petitions, exercised an authority that did not belong to him; and there is no other remedy than the writ of prohibition. It is clear, therefore, that that writ is the proper remedy. Ex parte *Morgan Smith,* 23 Ala. 94; Ex parte *Walker,* 25 Ala. 81; Ex parte *Greene & Graham,* 29 Ala. 52. The petitioner for the prohibition is the party whose custody of the conscript is interfered with, and we think he may make this application.

If we have the facts of these cases correctly presented to us in the petitions, the foregoing opinion is decisive of them. But, as the facts do not appear of record, we deem it the safer course to issue a rule *nisi* to the probate judge. 3 Blacks. Com. 113–14.

STONE, J.—Three several petitions for *habeas corpus* were presented to judge of probate of Montgomery county, by the petitioners, Asa J. Willis, Edward P. Johnson, and Calvin Reynolds; each alleging that he he was held a prisoner in custody by the enrolling officer, under the claim and pretense that he, the petitioner, was liable to do mili-

tary duty; while each petitioner averred in his petition, that he was advised and believed he was exempt from military service in the field, by reason of physical incapacity; each petition setting forth the particular disease which, it was alleged, operated the exemption. In neither of said petitions is it averred, that the petitioner has been examined by an *examining surgeon*, or *board of examination;* nor is it averred that he has been *held unfit for military service in the field, by reason of bodily incapacity or imbecility.* On the contrary, it is obvious from the face of each petition, that the applicant seeks enlargement, not on the ground that *he has been held* unfit for military service, but that he *is* in fact unfit to perform such service, by reason of bodily incapacity; which fact he seeks to establish by evidence on the trial of the *habeas corpus.*

The judge of probate issued writs of *habeas corpus* in the several cases; and the enrolling officer, denying the jurisdiction of the judge of probate in the premises, prays for writs of prohibition, directed to that officer, commanding him to surcease from the further exercise of such authority. The question is thus presented, has the judge of probate jurisdiction of the cases made by the several petitions? I hold, that he has not; and I shall proceed, as briefly as I can, to state the reasons which lead my mind to this conclusion.

The Confederate government, being engaged in war, has the unquestioned right to call the male residents of the Confederacy into the service. "As war can not be carried on without soldiers, it is evident," says Mr. Vattel, "that whoever has the right of making war, has also naturally that of raising troops."—Page 294. "Every citizen is bound to serve and defend the State as far as he is capable."—*Ib.* "No person is naturally exempt from taking up arms in defense of the State, the obligation of every member of society being the same."—*Ib.* Allegiance, or the duty to defend the State when assailed, is correlative to protection. The government owes the latter to the citizen; the citizen, the former to the government.—1 Blacks.

Com. 369 ; *Case of Isaac Williams,* 2 Cranch's Rep. 82, in note.

The acts of congress, known as the "conscript laws," are constitutional. The constitution of the Confederate States (art. 1, sec. 8, sub-divisions 11, 12, 13, 14) confers on congress the power "to declare war," "to raise and support armies," "to provide and maintain a navy," and "to make rules for the government and regulation of the land and naval forces." These are specific grants of power, in language free from ambiguity; and in neither of the clauses quoted, is found a word or syllable, which defines the mode or manner of executing the power. The same clause which gives the power to raise armies, gives also the power to support armies. The two words are coupled together by the copulative conjunction; and if the one power require the agency of State authority for its execution, by every sound canon of construction, the other power must equally require such agency. I go further: All the grants of power in the 8th section of the 1st article of the constitution (seventeen that are specific, and one general in its terms) are one continuous sentence, each clause being expressed in phraseology of kindred character; and if congress cannot directly execute the powers enumerated above, neither can that body directly execute the other powers therein granted. Now, when we reflect that, among the enumerated grants found in that section and *sentence,* are the power "to lay and collect taxes, duties, imposts and excises," "to borrow money on the credit of the Confederate States," to "regulate commerce with foreign nations," "to coin money," "to declare war," &c., surely no one can, with any plausibility, contend, that these several powers can only be exercised through State instrumentality.—*Prigg v. Commonwealth,* 16 Pet. 616.

The 16th clause of the section of the Confederate constitution which I am considering, contemplates that the *militia,* which constitutes the material out of which armies are to be raised, may be kept in a state of organization and discipline ; and, inasmuch as invasions or insurrections

may be suddenly precipitated upon us, or the execution of the laws of the Confederate States may be resisted in force, so as to require prompt and vigorous measures for the defense of the country and the welfare of society, congress is also empowered, by the 15th clause, "to provide for calling forth the militia." This is a separate clause, distinct from the authority to raise armies, and was deemed a necessary reserve to meet exigencies, in a country which revolted at the idea of large standing armies, or splendid military establishments in times of peace. The militia, for exigencies; the army, when war has become an established fact.

It being thus shown, as I think, that congress is clothed with power to raise armies by direct means, without calling to its aid State authority, it follows irresistibly, that congress is the sole arbiter of the means and machinery it will adopt for executing this power; with the well known limitation, that the means employed shall be both necessary and proper for carrying into execution the granted power; that is, as I understand this clause, that both qualifying words shall have operation and effect; *necessary* to the full enjoyment of the right; and *proper*—homogeneous and harmonious with our compound system of government. No matter how necessary the proposed means may appear, still, if it antagonize any of the reserved rights of the States or of the people, or militate against any of the principles which underlie our liberties, then it is not proper; and, on the other hand, if the means proposed be in harmony with every principle of our institutions, but not necessary to the full enjoyment of some power granted to the Confederate government, the employment of such means by that government would be a sheer usurpation. When I speak of incidents to the grants of power to the Confederate government, I mean express grants; for there should be no incidents to incidental powers.—See Federalist, No. 33.

The magnitude of the war that is being waged against us, renders it necessary that the government put forth its

greatest strength for the protection of our liberty and our property. This, I am satisfied, could not be accomplished by any means short of compulsory enrollment; and hence I hold, that the conscription acts are constitutional.

Various officers, agencies, rules and regulations, are necessary and proper instrumentalities in carrying into effect the expressly delegated power "to raise armies." Hence, these means are also constitutional; that is, they are necessary, and are not incompatible with the reserved rights of the States, or of the people. Many of these agencies, trusts and duties, require professional skill and knowledge, which can not be looked for in persons who have not had the advantages of military training and experience; and it was very natural that the government of the Confederate States should take to itself, and to officers of its own appointment, the determination of questions requiring such professional skill.

We have two acts of congress for the conscription of the citizens, one approved April 16th, 1862, (Statutes at Large, first session of first Congress, p. 29;) the other approved Sept. 27, 1862, (Stat. at Large, second session of first Congress, p. 61.) Each of these statutes authorizes the president to call out, and place in the army, all white men who are residents, between the ages specified, "who are not legally exempted from military service." Neither of them defines what residents, or classes of residents, are exempted from such service; but both statutes leave that subject to be disposed of by after legislation. Hence, every resident white man, within the specified ages, is liable to be called into the military service of the Confederate States, unless it can be shown that he comes within the provisions of the exemption statutes. We have shown above, that no person is naturally exempt from taking up arms in defense of his country; and it follows, that the *onus* is on him who claims exemption, to establish his right to it.

Imbecility, or disability, either mental or physical, is, *per se*, no legal exemption from military service in the army

of the Confederate States.    This results from the fact that exemption is a favor granted,—not a right conceded; and congress has no where said that mental or physical imbecility is a valid excuse for the non-performance of military service.    In granting this boon, congress had power to prescribe terms and conditions on which it could be claimed; and it did so.

The language of the acts of congress, defining exemptions on account of bodily or mental incapacity, is as follows: "That all persons who shall be held to be unfit for military services, under rules to be prescribed by the secretary of war, shall be, and are hereby, exempted from military service in the armies of the Confederate States."—Act approved April 21, 1862, C. S. Stat. at Large, 1st session of 1st Congress, p. 51.    The language of the act approved Oct. 11th, 1862, is as follows: "That all persons who shall be held unfit for military service in the field, by reason of bodily or mental incapacity or imbecility, under rules to be prescribed by the secretary of war, are hereby exempted from military service in the armies of the Confederate States."—Stat. at Large, 2nd session, p. 77.

I have thus quoted every word and syllable found in the acts of congress, which confer the right of exemption from military service, on account of mental or physical incapacity.    It will be seen that neither mental nor bodily disease is, per se, a ground of exemption.

By act of congress, approved Oct. 11th, 1862, (Stat. at Large, 2d session, p. 75,) it is provided, "that there shall be established in each county, parish or district, and in any city in a county, parish or district, in the several States, a place of rendezvous for the persons in said county, district, parish or city, enrolled for military duty in the field, who shall be there examined by one or more surgeons, to be employed by the government, to be assigned to that duty by the president, on a day of which ten days notice shall be given by the surgeon, and from day to day next thereafter, until all who shall be in attendance for the purpose of examination shall have been examined; and the decision

of said surgeons, under regulations to be established by the secretary of war, as to the physical and mental capacity of any such person for military duty in the field, shall be final." Section 2. "There shall be assigned to each congressional district in the several States, three surgeons, who shall constitute a board of examination in such districts, for the purpose specified in the foregoing section, any one or more of whom may act at any place of rendezvous in said district."

Provision had been made for the enrollment of conscripts, under other acts of congress.

Under the acts of congress from which I have given extracts above, the secretary of war has made and published the following rules:

"Questions of bodily and mental incapacity will be decided by surgeons employed for the purpose, by virtue of the act of congress approved on the 11th of October, 1862."

"Persons deemed incapable of bearing arms, shall be reported by the examining surgeon to the board of examination, who shall determine the questions of exemption, and grant certificates thereof. * * * So soon as the examining board shall be organized in any congressional district, and shall enter upon the discharge of their duties, no other mode of examination for persons in that district will be pursued; and the decision of the examining board will be deemed final."

"Applications for exemption must, in all cases, be made to the enrolling officer, from whose decision an appeal may be taken to the commandant of conscripts. The department will not consider the application, until it has been referred by the latter officer."

In the light of these statutes and these rules, I hold, that the petitions brought to view in the present cases show no ground which the judge of probate was authorized to inquire into or try. They do not aver that the petitioners had been "held unfit for military service in the field, by reason of bodily or mental incapacity or imbecility," under

29

rules prescribed by the secretary of war. They set forth the grounds on which they severally claim the right to be enlarged ; and when those grounds are examined, they are found wholly insufficient. They are as unimportant as the assertion of any other indifferent fact ; such, for instance, as that the petitioner was a white man, was the head of a family, &c. A petition, claiming enlargement on a ground so utterly frivolous as those supposed, could scarcely command the serious consideration of any court.

I have shown above, that congress, in granting the privilege of exemption on the ground of mental or physical unsoundness, has reserved to the secretary of war, and to surgeons for whose appointment it makes provision, the right of passing upon the question of unsoundness. In other words, the statute exempts only such persons as are decided by the surgeon, or board of examination appointed by the president, to be incapable of bearing arms. This, I think, was very natural and necessary. It brings the adjudication of this very difficult problem within the control of experts, and saves the public service from delay and detriment, which, in some instances, might result from ignorance or favoritism. It avoids inequality, by providing a stationary and uniform board of examination, whose decisions, we must presume, would be much more likely to be right, than the opinions of any and every practicing physician who might be called to testify. Be this, however, as it may, the acts of congress give to the surgeon, and to the board of examination, the exclusive right to pass on the question of mental or bodily incapacity ; and that takes from State courts all right to inquire into the question.—See Federalist, No. 82 ; 1 Kent's Com. 390, marg. ; *Houston v. Moore*, 5 Wheat. 1; *Sturgis v. Crowninshield*, 4 Wheat. 193 ; *Prigg v. Commonwealth*, 16 Pet. 625 ; *Moore v. Houston*, 3 S. & R. 179; *Blanchard v. Russell*, 13 Mass. 16 ; *Livingston v. Van Ingen*, 9 Johns. 507 ; 2 Story's Com. § 1755–6, and note 2 ; *Martin v. Hunter*, 1 Wheat. 304 ; Ex parte *Gist*, 26 Ala. 156.

I take a further step. The acts of congress cited in

this opinion, and the instructions framed under their authority, commit the determination of the various questions raised by the petitions for *habeas corpus*, to certain officers and agents of the Confederate government, and declare, in terms, that the decision thus pronounced shall be final.    Under these circumstances, the State legislatures have no authority to create a new forum, or clothe it with power to settle or retry the question of mental or physical capacity for military strvice.—See *Wayman v. Southard*, 10 Wheat. 1 ; *U. S. Bank v. Halstead, ib.* 51.    It would be passing strange, if State courts, in the absence of legislation, could perform functions which the legislature can not confer upon them.

Whether Confederate courts have, or can exercise, any greater powers over the question under discussion, is a subject not before me, and I will not decide it.

It may be contended, however, that while the foregoing argument may prove that State courts have no authority to *discharge* persons from military service on account of physical disability, *not shown to exist in the manner pointed out by the acts of congress, and the rules issued by the secretary of war ;* still, I have failed to establish the proposition, that State courts may not, in such case, issue the writ of *habeas corpus*, and inquire of the legality of the imprisonment.

To this I answer, first, that the petitioners for *habeas corpus*, by placing their claim to enlargement on a fact that is, in law, utterly indifferent and frivolous, fail to show on the face of their petitions that they are illegally restrained of their liberty.    The petitions do not contain the averment, common in such cases, that the petitioners are *illegally* restrained of their liberty.    The averment is, that they are, "prisoners restrained of their liberty ;" and they then set forth the ground, to-wit, physical unsoundness, on account of which, they aver and say, they are "advised by counsel and believe their imprisonment to be illegal."    Hence, there is a want of jurisdiction, in this, that the petitioners show themselves rightfully restrained, yet ask

the writ of *habeas corpus*, that the legality of that restraint may be inquired into.

But, secondly : Jurisdiction is *the right to hear and determine a cause.—United States v. Arredondo*, 6 Pet. 691, 709 ; *Sheldon v. Newton*, 3 Ohio State Rep. 490, 499. Jurisdiction, says Bouvier in his Law Dictionary, is "a power constitutionally conferred upon a judge or magistrate, to take cognizance of and decide causes according to law, and to carry his sentence into execution." In the case of *Rhode Island v. Massachusetts*, (12 Pet. 657, 718,) Mr. Justice Baldwin said, "Jurisdiction is the power to hear and determine the subject-matter in controversy between parties to a suit ; to adjudicate or exercise any judicial power over them." Now, it seems to me to be clear beyond all question, that the power, or rather the absence of power, in the probate judge, over the subject of complaint brought to view by the several petitions for *habeas corpus*, demonstrates an entire want of jurisdiction in that officer, under each and all the definitions above set forth. The *gravamen* of each petition is, that the petitioner is physically unable to perform military service. Jurisdiction is the right to inquire into the alleged fact of such physical disability. The probate judge has no authority to inquire into, or try that question ; therefore, the probate judge has no jurisdiction of the causes made by the several petitions.

If it be contended further, that the judge of probate had jurisdiction, because he had authority to decide, as a judge, that he would not and could not enter upon the trial of the question of physical disability ; the argument is just as strong, and no stronger than would be the assertion, that every court which dismisses or repudiates a cause for want of jurisdiction, thereby affirms its jurisdiction, and disproves the truth of its own solemn sentence. It is rarely the case that any court attains the conclusion it has not jurisdiction of a given subject, without construing some statute, or announcing some legal or constitutional principle, which deprives it of jurisdiction. In the great

case of *Dred Scott v. Sandford*, (19 How. 393,) the supreme court of the United States decided, that neither itself nor the circuit court had jurisdiction of the case made by the plaintiff; still that court enunciated some of the most important principles ever decided on this continent, and was compelled to decide many of them, to reach the conclusion that it had not jurisdiction of the case.

For these reasons, I hold, that the judge of probate has no jurisdiction of the cases made by the several petitions.

In an opinion, recently delivered by the chief-justice of the supreme court of North Carolina, I find that he concurs in denying to the courts power to retry the question of mental or physical incapacity.

When, on a former day, I delivered an opinion in these cases, I limited the operation of my remarks to cases which are in principle like the present, because there had not then been a conference between all the members of the court; and, as I felt inclined to differ from the chief-justice, on some propositions contained in his opinion, I purposely withheld my views until a full consultation with our absent brother could be had. That consultation has now been had; and although I am aware that, in what I am about to say, I go beyond the wants of the present case, I feel it a duty we owe to the public, that I make known certain other conclusions at which we have arrived.

A majority of the court holds, that the State courts have jurisdiction of the writ of *habeas corpus*, in all cases which come within either of the following classes : *First*, where the petitioner claims that the conscript laws do not reach him, or authorize his enrollment as a conscript, because he is under or over age, not a white man, or not a resident of the Confederate States ; *Second*, where the party claims that he stands absolutely and unconditionally exempt from military service, because he belongs to some sect or classs which the act of congress declares operates an exemption ; such, for example, as Friends who have complied with the law, and officers, judicial and executive, of the State and

Confederate governments. Questions may arise under the regulations which permit the putting in of substitutes, over which I would not hesitate to exercise jurisdiction; but, for reasons satisfactory to myself, I prefer not to define, at present, the extent to which I would exercise such jurisdiction.

Wherever, as in the present case, the privilege of exemption is granted on conditions, the adjudication of which is expressly reserved to certain officers named or provided for; or, where the acts of congress declare that the exemption shall cease and determine on the happening of certain events, *to be judged of and determined by the secretary of war, or other designated officer,* I hold, that such condition is a legitimate limitation on the boon of exemption, which congress had the clear right to impose; and that State courts have no authority to supervise the action of such officers, thus provided for and exercised, or to retry any question thus exclusively conferred on an officer of the Confederate government. To entertain jurisdiction in such cases, would lead to the most embarrassing and disastrous collisions between the authorities of the two governments.

I am of that school who believe, that the Confederate government is one of limited and defined powers, and that great care should at all times be exercised, to prevent it from enlarging its powers by construction. Our compound system of government, perhaps, exposes the States to encroachments upon their reserved rights, more than any other form of constitutional government could do. This grows, in part, out of the fact, that, within the sphere of their operation, the constitution of the Confederate States, and the acts of congress passed pursuant thereto, are the supreme law of the land. The constitution, in addition to its enabling clauses, which confer powers on the government, contains several restraints upon State authority. Under these clauses, an appellate jurisdiction was built up in the supreme court of the United States, which, in my opinion, was, in some instances, carried to an extent of doubtful propriety. I will not discuss this question here,

further than to say, that I think many of the imputed errors which crept into the old system grew out of the mistaken theory of the oneness of our distinct governments, and the too great subordination of the State to the Federal government.   One source of alleged encroachment of Federal upon State authority has been removed, by a wise amendment of the second section of the third article of the constitution ; and other amendments have also shorn our young government of much of the power which the old one wielded to our detriment.   I hope that, when the Confederate judiciary shall be fully organized, the heresies which aided in overthrowing the old Union, will not be allowed to enter the sanctuaries of the new.

I do not mean, in what I have said, to question the distinguished ability which has, at all times, marked the long and brilliant history of the Federal supreme court.   My precise meaning is, that, in my jugdment, false views of the powers of the Federal government, and especially of the relations which the States sustain to that government, found utterance at an early day ; and that the court in later years, although it burst some of the fetters by which early precedent had sought to confine it, left many of those errors unreversed.   Let us avail ourselves of the much good bequeathed to us by the many able minds which have adorned that bench at every period of its history ; but let us avoid the errors which time and experience have made manifest.

I have said that an early error crept into our system, as to the relation which the Federal and State governments sustain to each other.   In my opinion, we should struggle, from the very threshold of our existence, to keep the powers and functions of the two governments as distinct as possible.   The dividing line of jurisdiction, where no territorial boundary marks it, must, in the nature of things, be sometimes difficult of ascertainment.   Still, the line exists, and, when discovered, must be respected.   It is history, now made sadly impressive by the ocean of noble blood which it has caused to flow, that by trangressions of

this boundary line, sometimes by the Federal, and sometimes by State governments, our once prosperous and happy country is now the theatre of a war of almost unprecedented malignity and atrocity. That enlightened jurist and venerated patriot, Chief-Justice Taney, speaking for the court, felt and expressed the necessity of preventing encroachments by one jurisdiction upon the other; but his counsels came when fanaticism had well nigh matured its parricidal plot, the culmination of which is now converting portions of our rich domain into a desolation.—See *Ableman v. Booth*, 21 How. 506; *Dred Scott v. Sanford*, 19 *ib*. 393.

The jurisdictional area of each government should be kept distinct—restraining the Confederate government within the boundaries of its delegated authority, and not allowing the State governments to trespass on Confederate jurisdiction. The powers conferred on that government by the Confederate constitution, the laws enacted under its authority, and treaties made pursuant thereto, are the supreme law of the land. Let us respect and obey them as such. Let us not weaken or destroy our Confederate power, by embarrassing that government in the manly exercise of those functions with which the States themselves have clothed it. This will neither destroy nor impair the sovereignty of the several States. They are not despotisms. For certain general purposes, they have conferred on the Confederate government certain attributes of their sovereignty; but they retain the others. They have thus become constitutional, instead of absolute sovereignties.— This no more destroys State sovereignty, than does the surrender of certain attributes of natural liberty destroy civil liberty. In upholding and maintaining each government in the exercise of its constitutional authority, each will necessarily be kept within the appointed orbit of its powers. This, I humbly conceive, would effectually prevent all collision of jurisdictions. It need not, and would not, interdict the comities and kind offices which belong to good neighborhood. These should be cultivated and strengthened, as the life-blood of our confederate existence.

R. W. WALKER, J., not sitting.