JUNE TERM, 1864. 367

The State, ex rel. Dawson, in re Strawbridge & Mays.

# THE STATE, EX REL. DAWSON, IN RE STRAWBRIDGE & MAYS.

### [PETITION FOR HABEAS CORPUS.]

1. *State's right to subject to militia service persons exempted from military service of Confederate States as bonded agriculturalists.*—There is no constitutional provision, State or Confederate, which, directly or by implication, takes away or restricts the right of the State to subject to its militia service persons who have been exempted from the military service of the Confederate States, as bonded agriculturalists, under the provisions of the act of congress approved February 17, 1864, entitled "An act to organize forces to serve during the war.' (STONE, J., *dissenting.*)

2. *Construction of act approved August* 29, 1863, *exempting overseers from militia service.*—The act approved August 29, 1863, which exempts from militia service "all overseers who are, or shall be, exempted or detailed under acts of the Confederate congress, so long as they may be exempted or detailed as such," (Session Acts, August, 1863, p. 12,) applies to and includes only those overseers whose exemptions were granted under the acts of congress which were of force at the passage of said act, and not those who procured exemptions under subsequent acts of congress. (STONE, J., expressing no opinion.)

IN the matter of the two petitions of Wm. H. Fellows for the writ of *habeas corpus,* to procure the release and discharge of William L. Strawbridge and William C. Mays, respectively, from the custody of Capt. N. R. H. Dawson, who held them under his command as militia-men. The applications were made on the 6th August, 1864, to Hon. J. R. JOHN, chancellor, at Selma, who, on the hearing, granted a discharge in each case. The two cases were argued and submitted together in this court, on an agreed statement of facts, which was as follows:

"1. It is admitted and agreed, that said Wm. H. Fellows was, on the 1st day of January, 1864, the lawful administrator of the respective estates of E. R. Childers and John J. Strawbridge, deceased, each of which estates owned plantations in Dallas county on said 1st January, 1864; and that on each of said plantations there were, on said 1st

day of January, 1864, more than fifteen able-bodied field-hands, slaves, between the ages of sixteen and fifty years; and that said plantations and slaves were at that time, and have continued until the present time, under the control of said Fellows as such administrator; and that said Wm. C. Mays was, on said 1st January, 1864, duly employed by said Fellows, administrator as aforesaid, as the overseer of the plantation of said E. R. Childers for the year 1864; and that said William L. Strawbridge was, in like manner, duly employed and appointed by said Fellows as overseer on the plantation of said John J. Strawbridge, deceased; and that said overseers have continued in their respective employments on said plantations, from said 1st of January, 1864, until the present time.

"2. It is admitted and agreed, also, that on the — day of May, 1864, said Fellows, as administrator of said estates respectively, duly made applications for the exemption of said W. C. Mays and W. L. Strawbridge, as overseers on said plantations respectively, under the act of congress approved February 17, 1864, entitled 'An act to organize forces to serve during the war;' and that in making said applications, and in submitting the proof, and in the execution and delivery of the several bonds required to be given, with approved security, and in such amounts as required by the proper enrolling officer, the said Fellows fully complied with all the requisitions of said act of congress.

"3. It is admitted and agreed, also, that said W. C. Mays and W. L. Strawbridge, before the making of said applications for their exemption as overseers, had been regularly enrolled as conscripts by the enrolling officer of Dallas county at Selma, and that their names are now on his books as duly enrolled.

"4. It is admitted and agreed, also, that in the case of said Strawbridge, the bacon required by said act of congress to be delivered to the Confederate government, as one of the conditions of the exemption, has already been furnished by said Fellows, and received by the Confederate States government.

"5. It is agreed also that, under the act of congress aforesaid, the said Fellows is entitled, as administrator° as

JUNE TERM, 1864. 369

The State, ex rel. Dawson, in re Strawbridge & Mays.

aforesaid, to have the said Strawbridge and Mays exempted as such overseers from the Confederate States service, and has done everything on his part required to be done, by said act and the regulations made to carry out the same, to entitle him to such exemptions; but that neither the said Fellows, nor the said Strawbridge or Mays, has received any exemption papers from the authorities of the Confederate States, though said Strawbridge and Mays have, from time to time, received paper writings from the conscript officer, as follows:" (The documents here set out are the same in form, and are signed by the enrolling officer of Dallas county; and each states, that said Strawbridge (or Mays), "having been enrolled in this office, and application for his exemption as an overseer having been made, he is hereby furloughed for thirty days, to await decision upon said application.")

"6. It is admitted and agreed, also, that said Strawbridge and Mays, while in this position with reference to the Confederate service, were ordered out by the proclamation of his excellency, Governor Watts, dated the 25th July, 1864, as a part of the second-class militia of the State, and, with others, were formed into a company at Selma, of which company said N. R. H. Dawson was elected captain; that said Mays and Strawbridge all the while protested against their liability to service as militia, and waived none of their rights; that they were held by said Dawson as their captain, duly appointed, under the authority of the State of Alabama; and that each of them is between eighteen and forty-five years of age.

"Under the facts above stated, the chancellor decided that the said Mays and Strawbridge were not liable to service in the second-class militia, and ordered them to be discharged. Now, it is agreed that the two cases be submitted to the supreme court for decision, at its present term, on the facts above stated; the parties agreeing to waive all formal defects, and to consider the cases as regularly and formally before the court, and to present to the court for decision the single question of the liability of said Strawbridge and Mays to militia service in the second class. If, under these facts, said Strawbridge and Mays

are liable to such service in the militia, then the said Dawson is entitled to hold them in the service as their captain, and the decision of the chancellor is to be reversed. On the other hand, if they are not so liable, they are to be discharged, and the chancellor's decision is to be affirmed; and the costs are to abide the result."

W. P. CHILTON, for the State.

GEO. W. GAYLE, for the petitioners.

PHELAN, J.—The person in whose behalf the petition for *habeas corpus* in this case was preferred, has been enrolled as one of the class No. 2, under the act of the legislature of Alabama, entitled "An act to organize the militia of Alabama," approved 29th August, 1863, and claims an exemption from service in that class, on the ground that, under the provisions of the act of the Confederate States congress, entitled "An act to organize forces to serve during the war," approved 17th February, 1864, he is entitled to exemption from the Confederate service, as "the overseer of a plantation having fifteen able-bodied hands"; the proper bond having been given by his employer, and the other conditions of that act necessary to secure an exemption having been all complied with.

This exemption from militia service in class No. 2, is claimed under the provisions of the act of Alabama, approved August 29th, 1863, entitled "An act declaring who shall be exempt from militia duty in this State", and specially, under the clause in the 1st section of that act, which reads as follows : "All *overseers* who are or shall be exempted or detailed under acts of the Confederate congress, so long as they may be exempted or detailed as such".—Acts of called session, 1863, p. 13.

The question is one of construction; and the precise question is—does the State law just quoted, exempting "overseers," relate to and embrace only acts of the Confederate congress then in existence; or, does it also relate to and include acts or laws of the Confederate States which might be subsequently enacted, exempting *overseers.*

This question is not free from difficulty, and has there-

fore engaged our anxious attention. The majority of the court are of opinion, that the provisions of that act were not intended to relate to or include acts of congress which might be *subsequently* enacted, but only those *then in existence*. Before we can come to just conclusions on this question, it is necessary to take a view of the legislation both of congress and our State legislature, on the subject of exemptions of this class.

By the act of congress of 11th October, 1862, (Acts 1st session 1862, p. 79,) it was declared, that "to secure the proper police of the country, one person, either as agent, owner, or overseer, on each plantation on which one white person is required to be kept by the laws or ordinances of any State, and on which there is no white male adult not liable to do military service, and in States having no such law, one person as agent, owner, or overseer, on each plantation of twenty negroes, and on which there is no white male adult not liable to military service", should be "exempted from the military service in the armies of the Confederate States."

This same act contains a general clause on the subject of exemptions, which is in these words : "And such other persons as the president shall be satisfied, on account of justice, equity, or necessity, ought to be exempted, are hereby exempted from military service in the armies of the Confederate States."

This law was repealed by the act of May 1, 1863, (Acts Confederate States, 3d session, 1863, p. 158,) so far as related to the "twenty-negro" clauses, but left unrepealed as to all the rest, and the following enacted :

" Sec. 2. For the police and management of slaves, there shall be exempted one person on each farm, or plantation, the sole property of a minor, a person of unsound mind, a *feme sole*, or a person absent from home in the military or naval service of the Confederacy, on which there are twenty or more slaves : *Provided*, the person so exempted was employed and acting as an overseer previous to the 16th of April, 1862, and there is no white male adult on said farm, or plantation, who is not liable to military duty; which fact shall be verified by the affidavits of said person, and two

respectable citizens, and shall be filed with the enrolling officer; *And provided,* the owner of said farm or plantation, his agent, or legal representative, shall make affidavit, and deliver the same to the enrolling officer, that after diligent effort, no overseer can be procured for such farm, or plantation, not liable to military duty; *Provided further,* that this clause shall not extend to any farm or plantation on which the negroes have been placed by division from any other farm or plantation since the 11th day of October, 1862; *Provided further,* that for every person exempted as aforesaid, and during the period of such exemption, there shall be paid annually into the public treasury, by the owners of such slaves, the sum of five hundred dollars."

This last law was repealed by the act of 17th February, 1864, and a new exemption law passed, the 4th clause of the 10th section of which reads thus:

"4. There shall be exempt one person as overseer or agriculturalist on each farm or plantation, upon which there are now, and were on the first day of January last, fifteen able-bodied field hands, between the ages of sixteen and fifty, upon the following conditions:

"1. This exemption shall only be granted in cases in which there is no white male adult on the farm or plantation not liable to military service, nor unless the person claiming the exemption was on the 1st day of January, 1864, either the owner and manager, or overseer of said plantation; but in no case shall more than one person be exempted for one farm or plantation.

"2. Such person shall first execute a bond, payable to the Confederates States of America, in such form, and with such security, and in such penalty as the secretary of war may prescribe, conditioned that he will deliver to the government, at some railroad depot, or such other place or places as may be designated by the secretary of war, within twelve months next ensuing, one hundred pounds of bacon, or, at the election of the government, its equivalent in pork, and one hundred pounds of net beef (said beef to be delivered on foot), for each able-bodied slave on said farm or plantation, within the above said ages, whether said slaves work in the field or not; which said bacon or pork and

beef shall be paid for by the government at the prices fixed by the commissioners of the State under the impressment act: *Provided*, that when the person thus exempted shall produce satisfactory evidence that it is impossible for him, by the exercise of proper diligence, to furnish the amount of meat thus contracted for, and leave an adequate supply for the subsistence of those living on said farm or plantation, the secretary of war shall direct a commutation of the same, to the extent of two-thirds thereof, in grain or other provisions, to be delivered by such persons as aforesaid at equivalent rates.

"3. Such person shall further bind himself to sell the marketable surplus of provisions and grain now on hand, and which he may raise from year to year while his exemption continues, to the government, or to the families of soldiers, at prices fixed by the commissioners of the State under the impressment act: *Provided*, that any person exempted as aforesaid shall be entitled to a credit of twenty-five per cent. on any amount of meat which he may deliver within three months from the passage of this act: *Provided further*, that persons coming within the provisions of this exemption shall not be deprived of the benefit thereof by reason of having been enrolled since the 1st day of February, 1864."

We come then to the question as to what is the true construction of our State law. A great deal has been said and written by law-writers on the rules and maxims which should govern the courts in the construction of written law. One rule laid down, and which I consider eminently sound, is, that in the construction of a *constitution*, or *fundamental law*, more weight should be attached to the mere words, than in the construction of an *ordinary statute ;* because, in framing the provisions of a constitution, the lawmakers act with great care and circumspection, and every word is well sifted and settled, while in passing ordinary statutes this unfortunately is known not to be the case, but that they are often passed without having their language carefully chosen and critically considered.

I can find nothing, which comprehends in a short space the general rules which should govern in this matter, more

concisely and clearly stated, than the response of Parsons, C. J., and the other judges, to the Massachusetts legislature, 7th Mass. R. 523.

"Two of these maxims (whereby to come to a reasonable construction) we will mention :

1. "That the natural import of the words of any legislative act, according to the common use of them, when applied to the subject-matter of them, is to be considered as expressing the intention of the legislature, unless the intention so resulting from the ordinary import of the words be repugnant to sound, acknowledged principles of public pol'cy."

2. "And if that intention be repugnant to such principles of national policy, then, the import of the words ought to be enlarged, or restrained, so that it may comport with those principles, unless the intention of the legislature be clearly repugnant to them. For, although it is not to be presumed, that a legislature will violate principles of public policy, yet, an intention of the legislature repugnant to those principles, clearly, manifestly, and constitutionally expressed, must have the force of law."

A court which will fairly carry out these maxims I do not think can greatly err in construing a statute.

We have, first of all, then, to look to the "natural import of the words," "according to the common use of them." Words, we all know, and have often reason to lament, are but imperfect vehicles of thought, although our best. A great deal must be always left to implication ; because, to bring out every thought or idea with fullness would result in tedious repetitions, even in our most common communications. But, yet, when we wish to get at a full meaning, we can only do so properly, by resorting to natural and necessary implications.

The language of the statute of Alabama, is this: "All overseers who are, or shall be, exempted or detailed, under acts of the Confederate congress," &c.

Under the rules of interpretation set out above, I find no difficulty in holding, that the word "overseers," in our statute, is used in its common and popular signification throughout the slave States, to designate a class of men who

JUNE TERM, 1864.    375

The State, ex rel. Dawson, in re Strawbridge & Mays.

have the management of slaves on a plantation or else-where, as the agent or employee of the owner; and to distinguish them from the class of owners. It has become with us a technical word, and, as such, was used in the statute. And our statute, in this use of the word, only followed and adopted the word as used in the act of congress of 1st May, 1863, which had then lately been passed.

And, next, as to the words which follow; do they mean such " overseers as are, or shall be, exempted" &c., under the acts of congress *then in force*, or do they refer not only to such, but likewise to acts which might be *subsequently* enacted. The words "shall be," being in the future tense, point, of course, to future action; but, does this apply to the future *acts of congress* which might be enacted, or only the *future exemptions* which might take place under the acts then in force? That is the question.

If, now, we will take the statute of Alabama, and supply such words as are necessary to bring out its full meaning, and are, therefore, clearly implied, it will read as follows : " All overseers who (now) are, or shall (hereafter) be, em-ployed, or detailed, under (existing) acts of the Confederate congress, so long as they shall be exempted or detailed as such." " Who are," is in the present tense, and, fully expressed, means " who *now* are; " " shall be, " is in the future, and means "shall *(hereafter)* be." "Acts," is a noun substantive, and signifies, not acts or laws yet to be made or passed, but acts now in force; *existing* acts.

If this be correct, as I think it is, according to the plainest rules of grammatical analysis, then the language of the statute constrains us to hold, that exemptions under exist-ing acts, or laws of congress, was the sole intention of the legislature; and that, where future action was contemplated, it was future exemptions under *existing acts*, and not *future acts* and exemptions under such future acts.

This view is strengthened by supplying to the same words, and under the same rules, the implications and ellipses necessary to bring out the full meaning, under the supposition that the legislature intended to have reference, not only to the acts of congress then existing, but to any acts that congress might afterwards enact on the subject.

The law would then read thus : " All overseers who (now) are, or shall (hereafter) be, exempted or detailed under (existing *and future*) acts of congress," &c. Here it will be observed, the word *future* has to be supplied in addition to the word *existing*. But *existing* is a just and necessary ellipsis that must be supplied, to give to the word "acts" its precise and proper meaning, and is, therefore, clearly implied. But, with the word *future*, such is not the case. It is not necessarily implied, but is arbitrarily introduced, and gives to the word *acts* a new and more extended meaning than the word, as it stands in the sentence, can fairly and properly import. It is another qualifying adjective, not necessary to the full legitimate meaning of the word *acts;* for all acts are, properly speaking, *existing* acts ; and gives to that word another, and a different meaning. The laws of sound grammatical construction will not justify this. Ellipses can only be supplied by such implications as are necessary to bring out the *full meaning* of a sentence, but not to *extend* or *contract* its proper signification.

If the law, as it then stood, did not contemplate *future* exemptions under *existing* acts, then the further implication of the word " future," might be justified, I admit, but not otherwise. But, it is quite manifest, that *future* exemptions under *existing* acts were contemplated. Under the act of congress of 1st May, 1863, new cases would continually arise from time to time ; and besides this, the act itself required that exemptions under it should be renewed *annually*, since those who procured exemptions for overseers of *femes sole*, minors, &c., should pay annually the sum of five hundred dollars.

But it has been argued, that this interpretation cannot be justified, because the Alabama statute uses the word "*acts*," in the plural number, and there was but a single act of congress then in force, under which exemptions to overseers could be granted—namely, the act of 1st May, 1863 ; and, therefore, to fulfill the intention of the legislature, the word *future* must be implied, before the word *acts*, as well as the word *existing*, because the legislature must have contemplated exemptions under a future act or acts, as well as future exemptions under the existing act. This

argument would have force, if it were not founded upon a misapprehension of the facts of the case. The law of 1st May, 1863, was not the only act of the Confederate States congress then existing, under which *overseers* might be exempted. In the act of congress of 11th October, 1862, there was this clause, standing in juxtaposition with the "twenty negro" clauses of that act: "And such other persons as the president shall be satisfied, on account of justice, equity, and necessity, ought to be exempted, are hereby exempted from the military service of the Confederate States." Now, the act of 1st May, 1863, while it repeals the "twenty-negro" clauses of that act, left unrepealed, and in full force, the clause I have just quoted, and this clause was an existing law when our act of 29th August, 1863, was passed; and the only question to be considered is, whether, under this clause, "overseers" could be exempted by the president. This seems to me too manifest to admit of doubt. Even with the act of 1st May in full force, cases would probably arise of plantations having *less* than "twenty slaves," where this general clause would have to be invoked for the exemption of "overseers," on the general grounds of equity and necessity; and we have a right to suppose that this was one reason, with others, why it was allowed to stand, when the "twenty-negro" clause, as a policy, was abandoned.

Another argument against giving to the word "acts" a prospective operation is this. The "twenty-negro" law, as it is commonly called, caused great dissatisfaction, both with the country and army. This is matter of history, and is sufficiently evinced by the prompt and almost unanimous repeal of those clauses, by the first congress which met after their passage. At the same time that congress repealed those clauses, they framed, evidently with great care, the law of 1st May, 1863, which allowed "overseers," under certain restrictions, to be exempted, for the benefit of certain helpless and highly meritorious classes of persons—namely, single women, minors, insane persons, and "persons absent from home in the military and naval service of the Confederate States," upon the payment annually of five hundred dollars, for each overseer so exempt. This

24

law, although allowing exemption to *overseers*, was received, I think, by the country generally, with satisfaction, because it was, in fact, a needful provision for classes of persons, necessarily quite few in number, and either helpless, or highly meritorious; while, at the same time, the production of subsistence was promoted by it. This, and the unrepealed clause of the act of 11th October, 1862, above quoted, were the Confederate laws which authorized the exemption of "overseers," at the time the "act to organize the militia of Alabama," and the "act to exempt from militia duty," in connection with the same, were passed by the legislature of Alabama, 29th August, 1863. Under this state of the case, there is every reason to think, that the legislature, in passing its exemption law of August 29, 1863, meant only to respond to the recent action of the congress, in relation to *overseers;* and that there is no reason to believe they designed to go further; and especially, that they did not design, by the use of the words "overseers that are, or shall be, exempted or detailed under acts of the Confederate congress," to invite, by prospective legislation on the part of the State, a return to that policy of general exemption for *overseers* (and others having the management of slaves) which congress and the country had just *repudiated;* which the construction contended for would certainly accomplish. But, the ill consequences of such a construction would not stop at this; for the exemption act, if that construction be put upon it, would provide exemptions for all the *overseers* that congress might subsequently exempt, but would leave owners and small proprietors, who could not engage *overseers*, without such exemptions. This would be a species of partiality and favoritism, for which there could be no adequate motive; and that consideration, of itself, goes far to repel a construction which would lead to it, and to give strength to the other arguments in favor of a different construction. On the whole, then, I am of opinion that the act of 29th August, 1863, does not look to prospective legislation, and that exemptions granted to *overseers* under the subsequent act of February 17th, 1864, do not come within its provisions.

But it is insisted, that all *overseers* and agriculturalists, where bond has been given pursuant to the act of congress of 17th February, 1864, and the other conditions of that statute complied with, are exempt from service in the State militia, irrespective of the exemption law of the State.

The argument relied on to support this proposition, may be concisely stated thus : The constitution of the Confederate States, and laws made in pursuance thereof, are the supreme law of the land; and if the laws of the State, and those of the Confederate States aforesaid, come in conflict, the former, as the paramount law, must prevail ; that congress has power to raise and support armies ; that the exemptions granted to overseers and agriculturalists were designed to provide support, in the way of subsistence, for the army ; and that the *proviso* which declares " that the exemptions granted under this act shall only continue whilst the persons exempted are *actually engaged* in their respective pursuits or occupations," must be construed to mean, that all those persons who are exempted shall continually employ their own personal skill and labor in and about the pursuits or occupations, on account of which they are exempted.

To all the propositions above I am ready to assent, except the last; and as that is the crowning one of the series, if that will not hold good, the whole must fail ; and to the last I object, because it puts a construction on the language of the act which I do not think it was intended to bear. I will proceed to give my reasons.

First. Such a construction would make exemptions under the act, in reality *details*, and would destroy the distinction, which is a very broad and material one, between *exemptions* and *details*. This distinction is one fully recognized and established on many grounds. In the first place, it arises naturally out of the words themselves, and the things which they clearly import. An " *exempt* " is one who is "free from any charge, burden, or duty "; "not liable to," &c. A *detail*, on the contrary, is one who belongs to the army, but is only *detached, or set apart*, for the time, to some particular duty or service, and who is liable, at any time, to be recalled to his place in the ranks. This distinction is

made by the law itself, which uses the two words obviously for different purposes. In the 1st, 2d, 3d, 4th, 5th, and 6th articles of section 10, of the act of 17th February 1864, the word *exempt* only is used, except in the last clause of the 4th article, where the words are "exempt or detail," and in the 11th section of the same act, the word *detail* only is used, showing that the law-makers themselves had a distinct perception of the different signification of the two words.

The construction put upon that act by the officers of the Confederate States having charge of the matter, and who can hardly be supposed to have any leaning against their own government, makes the same distinction. In the instructions put forth by the "*bureau of conscription*" at Richmond, of March 16th, 1864, intended to inform the "*commandants of conscripts*" what interpretation it was proper to put upon that act, we find these words:

(Article) "6. Persons and classes enumerated in 1st, 2d, 3d, 4th, 5th, and 6th articles of section 10, except those referred to in the latter clause of the 4th article of said 10th section of the act of congress recited, shall be *exempted*. All other persons referred to in said act shall be *detailed*."

It is needless to pursue this topic. The words themselves, by common usage, and the interpretation put upon the act by the Confederate States government itself, import a clear distinction; and if congress had designed that overseers and agriculturalists should not be *exempted*, but only *detailed*, they would have used the word that would have aptly expressed that meaning. As they have not done so, but have used a well-defined word of a different meaning, it does violence to the word they did use, to say it was meant to signify something else.

This view is strengthened by considering that, at the time congress passed this law, the terms *exempt* and *exemption* had undergone much discussion, and had been the subject of judicial construction. In this State, the case of *Ex parte* McCants, (1 Ala. Sel. Cases, p. 715,) had been decided, and was generally known, in which it was held that a person who had been discharged or *exempted* from Confederate States service, by furnishing a substitute, was

still liable to service in the State militia. With that decision before the country, it is not improbable that congress preferred to grant *exemptions*, rather than to authorize *details*, for the very reason that *exempts* would be liable to service in the militia of the States, and *details* would not ; for we must presume that the members of congress did not wish to leave their respective States wholly destitute of a State military force ; and as the ages of conscription were becoming so greatly extended, that this was likely to happen, unless the *exempts*, as a class, were expected and intended to be liable to militia duty at the call of the States. The exempts under the act of 17th February, 1864, taken together, constitute a numerous body of men. It includes, among others, the whole body of the civil officers of the State, ministers of religion, physicians, one editor of each newspaper, and a certain number of printers, one apothecary for each drug-store, all presidents and teachers of colleges, academies, and schools of two years standing, &c. Now, in granting exemptions to those just named, and looking at the decision in the case of *McCants, (supra)*, is it reasonable to hold that the congress of the Confederate States designed, that they should be exempt from militia service to the State, should the State see proper to meet emergencies to require their services, simply because they were exempt from Confederate service ? The State of Alabama, by her act of December 6, 1862, (Acts of 1862, p. 63,) had made all her justices of the peace and constables, and notaries public, within the conscript ages, liable to Confederate service, by making them subject to militia duty; and surely congress could not design to make those of that class exempt again from militia duty, by declaring them exempt from Confederate service. And there could be no more reason for doing so in the other cases above mentioned ; for what special care or concern can or ought the Confederate States to have for the interests of religion, or education, or the sick in Alabama, that Alabama herself ought not to be expected to have in a much greater degree? It is plain, I think, that it was the general expectation and design of congress, that the States should look to the *exempts* from conscription to help form a State militia,

likely, under the circumstances, to be too few any way; and that the list of *exempts* was allowed to embrace so large a number of persons, at a time when the demand for *conscripts* was so pressing, in some degree under that influence.

But great stress is laid on the *proviso* to the 6th article of section 10. I venture here the opinion, that the construction of the statute would have been the same, without the *proviso*, as with it. It is nothing more than the expression of what was clearly implied, if it had never been added. In fact, the first exemption act passed by congress—that of April 21st, 1862, (see Acts of 1862, p. 51,) had no such *proviso;* and yet there can be but little doubt, that if the persons exempted by that act had not continued "actually engaged in the pursuits and occupations on account of which they were exempted," their exemptions would have ceased and become null. The true interpretation of that act would require, that where an exemption was granted to a person because he filled a certain *status*, or description, not *feignedly* or *pretendedly*, but *actually* and *really*, such person would be held bound to continue actually and really, or *bona fide*, to mantain the *status* or character on account of which the exemption was granted, and, if he voluntarily abandoned, or renounced it, or *mala fide* made a sham, and a pretense of being what he really was not, his right to an exemption, according to the true intent and meaning of that law, would cease and become forfeit. This was the law without any such *proviso*, and I cannot think the *proviso*, which was added to the subsequent exemption acts, namely, that of October 11, 1862, and that of February 17, 1864, (which is in the same identical words in both acts,) was designed to do anything more than to give greater fullness to the law, by making that *express* which was before only *implied*. And, to any argument which may be urged, that this *proviso* was added to the act of 17th February, 1864, because that act required the producers of meat and grain to give bond, &c., and this *proviso* was intended to fortify those provisions of the law, and make them effectual; it may be answered, that the act of 11th October, 1862, which contains no such provisions, contains, nevertheless, the very same *proviso*.

Particular stress is laid on the words "actually engaged"; and it is insisted, that this condition connot be fulfilled by the exempt, if he is made to serve in the State militia; that "actually" means *personally* or *corporeally* engaged; that it is the proper antithesis of the word *constructively*, and, therefore, the Confederate States intended to secure the entire personal or corporeal services of its exempts, and that any interruption by the State of that continued personal service would be inconsistent with the design of the Confederate law. These words, taken in their common acceptation, will not, I conceive, admit of such a construction. In law, it is true, the words. *actual* and *constructive* are the anthithesis of each other, when used in reference to *treasons, notices, possessions, frauds,* and in some other cases. But here they are *law terms*—terms of art. This is not the manner in which the words of a statute are to be taken, unless that is evidently intended; which is not the case here. These words must be taken, according to all the authorities, and the leading maxim of Chief Justice Parsons, *supra,* in their "natural import—according to the common use of them". And what is the natural import of "actually engaged", according to the common use of them? When we say in common parlance of a man, that he is "actually engaged" in farming, or planting, *does* it necessarily imply that he must give his constant personal supervision to his farm or plantation? Does it mean anything more than that such a man has a farm or plantation in active operation, on his own account, whether he conducts its daily affairs through an overseer, or in person. The words embrace both cases. And so of many, if not most other pursuits and occupations. The words "actually engaged", in common parlance, mean "really, or truly engaged"—engaged "in fact", and, according to the same law of common use, are the opposite or antithesis of "seemingly", or pretendedly", or "feignedly engaged". In the common acceptation of the words, the same man may be "actually engaged" in two or more pursuits, or occupations, at the same time. We have numerous instances in our country where the same man is, at the same time, a merchant and a planter, a physician and a planter, a lawyer, or

a judge, and a planter. In fact, it is a common thing for men of good property to combine the business of planting with some other pursuit or occupation. Many men do not stop at two, but unite in themselves three or four, in all of which, according to common parlance, they are actually engaged.

There need be no such great alarm about the supervision of the labor of the country. If the holy cause of liberty requires it, many more farms and plantations can be pretty well managed, as thousands now are, where their brave owners have either laid down their lives, or stand ready to do so in the ranks of their country, without the supervision of able-bodied men. The heroic women, with their bare-footed boys and girls, the old men, the convalescent or disabled soldiers, and though last, by no means least, the experienced and faithful negro, will do the business. The want of subsistence, from the beginning of this gigantic struggle for all that men hold dear, up to this time, though sometimes, and in some places, pressing, has never been half so pressing as the want of able-bodied men to recruit the ranks of our noble and devoted armies.

Upon the whole, then, I conclude, that the construction put upon the act of February 17th, 1864, and especially the *proviso* to the 6th clause of the 10th section, by which the persons declared to be *exempted* under that act, are held to be *details*, or in the nature of details, is not the proper construction; but that, on the contrary, such persons are *exempts proper*, that is, persons for the time "free," or "not liable to" conscription, and as such liable to serve in the State militia.

If this be true, it is needless to argue formally against the apprehension, that as soon as the State takes them as militia-men, the Confederate States may retake them as conscripts, on the ground that they had forfeited their right to exemption. If a man is set free from the lawful dominion of the Confederate States, for a day, or an hour, and the State enrols him as her soldier, there is no power on earth that can lawfully take him from her ranks, or divest him of that character, without her consent, unless State sovereignty is an idle word. Under the construction

of the exemption laws lately announced from the war department, there is not the slightest reason to apprehend that any such attempt will be made.

When this case was tried below, the party was discharged by the chancellor from the control of the State militia officer, upon the ground that, upon the case made before him, it did not appear that he had then been either "bonded, exempted, or detailed". Nothing was decided in regard to the true meaning of the act, but only that, under the formalities required, no right of exemption, even saying that such might afterwards accrue, had then been consummated. When the case was brought up, the parties, in order to get a decision upon the merits, put the record, by agreement, in such a shape as to authorize and call for such a decision. From the statement of facts agreed upon, it appears that application for an exemption for said Mays as overseer, was made by Mr. Fellows, as administrator of an estate, sometime in May, 1864, and bond given with "approved security, and in such amount as was required by the proper enrolling officer"; and that "he had done every thing on his part required by such act, and the regulations made to carry out the same, to entitle him to such exemption." It is further stated, that in the case of Strawbridge the bacon required by the act had already been furnished. It is then stated, that up to the date of the hearing, 6th August, 1864, no certificate of exemption had been issued to the parties, but only "thirty day furloughs" by the Confederate States enrolling officer for Dallas county.

The Confederate States statute requires, that persons making application for these exemptions, in addition to some other less important conditions, shall "execute a bond to the Confederate States, in such form, and with such security, and in such penalty, as the secretary of war may prescribe" &c. Among the orders and regulations under this act from the *"bureau of conscription"*—a branch of the war department—to the *"commandants of conscripts"* in the several States, it is prescribed, that applicants shall execute bonds—the form of which is given—to be taken by the enrolling officer of the county, in which the applicant resides, by and with the advice of the *"county board"*, as to

the sufficiency of the security. "Such bonds, after due execution, shall be transmitted to the commandant of conscripts." Upon being informed by the commandant that the bond is approved, the county enrolling officer is to grant a certificate of exemption for twelve months to the applicant.

Why so great a delay was allowed to intervene, after the bond had been executed, and all other things done, which were necessary under the law to entitle the party to his exemption, without the issue of the certificate of exemption, is not shown. All such formalities are required to be done within a reasonable time, where no time is prescribed; and if not so done, and the rights of a party himself, or of third persons, or of the State are to be affected, what ought to be done, will be considered as done. With the long interval from May to August, more than reasonable time had elapsed for the issue of the certificate; and as no reason is assigned why it did not issue, we must hold the party to be entitled to his exemption, so far as this question is involved, without it. The facts stated show a clear right to an exemption, and a right cannot be defeated, because the formal evidence of that right is unreasonably delayed, or even withheld altogether. The certificate is not the exemption, but only the evidence of it; and if the right to an exemption has been acquired according to the statute, that right will be upheld, either at the instance of the party himself, or any other having rights connected with and dependent upon it. The principles settled in the case of *Marbury v. Madison*, (1 Cranch 137,) go to this extent. See, also, *Billy v. The State*, 2 Nott & McCord, 356.

The decision of the chancellor is reversed, the writ of *habeas corpus* dismissed, and the party declared liable to the lawful control of the State militia officer.

The two cases rest upon precisely the same state of facts, and were argued together; and this opinion and decision is intended to cover both.

————

A. J. WALKER, C. J.—It is contended that agriculturalists, exempted from the military service of the Confed-

erate States by the 4th article of the 10th section of the
act of congress of 17th February, 1864, are free from
liability to militia duty, without the aid of any exempting
State legislation.   The outline of the argument is, that
congress has the power to support its army; that, as a
means of accomplishing that purpose, it employs the agency
of those agriculturalists ; that the State, by subjecting them
to militia service, interferes with and impedes the general
government, in the exercise of a means to execute a consti-
tutional power, and that this the State has no right to do.

It is attempted to rest this argument upon the principle,
which was first declared in the memorable case of *McCul-
loch v. Maryland*, (4 Wheaton,) in which the supreme court
of the United States denied the authority of a State to tax
the United States bank.   The opinion in that case certainly
contains passages, which, detached from the context, import
an utter abnegation of the State authority over any instru-
ment used by the general government to execute its delegated
powers.   The same remark may be made in reference to
the opinion in the case of *Osborne v. United States Bank*,
(9 Wheaton,) where the doctrine of *McCulloch v. Maryland*
was reviewed and re-affirmed; and in the case of *Weston v.
City Council of Charleston*, (2 Peters,) which denies the
power of a State to tax United States stock issued for loans
to that government; and in the case of *Dobbins v. Comm'rs*,
(16 Peters,) which places the offices of the United States
officers beyond the reach of State taxation.   These decisions
all relate to agencies or instruments created by the govern-
ment of the United States, and not to persons or property
remaining within the jurisdiction of a State, and protected
by its laws and government ; and I am not inclined to think
it was designed to give the principle a larger extent.   In
my opinion, it was not intended to assert in those cases an
incapacity of the States to exert their atttributes of sove-
reignty in reference to any other instruments, than the
institutions or agencies created by the general government
for the execution of its powers ; and this, I believe, a careful
examination of the entire opinions in reference to the point
involved will demonstrate.   But I will not enlarge on this
point, as it may be yielded without affecting the result.

Let us, then, consider the question presented, upon the supposition, that the instruments or means employed by the Confederate States are, upon the principle declared by the supreme court, exempt from the State authority. It will be material to inquire into the full scope and effect of the proposition, if it embraces the exempted agricuturalists. It must be observed, that the principle, where it operates, places beyond the sovereignty of the State instruments employed by the general government to execute its powers. Chief-Justice Marshall says, that the sovereignty of a State does not extend to those means which are employed by congress to carry into execution powers conferred upon that body.—*McCulloch v. Maryland, supra,* pp. 429–430; *Weston v. City Council, supra,* p. 467.

The act of congress, in consideration of a contract to sell and deliver a prescribed amount of meat on certain terms, and to sell the surplus products of the plantation to the government, or to soldiers' families, on certain terms, provides an exemption for agriculturalists on plantations with fifteen able-bodied hands, and limits the exemption by the duration of their employment in the specified agricultural pursuit. The whole scope and scheme of the act manifest the purpose to obtain an application of the skill and industry of the exempted agriculturalist to the production and supply of provisions, by directing the labor of slaves in the cultivation and harvesting of crops, and the rearing and saving of beef and pork. To the accomplishment of this purpose, the slaves, stock, and plantation, are as indispensable, as the supervising agriculturalist; and the design of the law would be as completely defeated by any interference with them, as with the agriculturalists themselves. The slaves, and the land they cultivate, and the cattle used in cultivating it, are means used by the government to produce provisions for the support of its army, if the exempted owners and overseers are.

The argument, then, which applies to this case the principle above stated, takes all the exempted agriculturalists, the plantations, negroes, and stock, and places them together beyond the area of State sovereignty and jurisdiction. The State, in the exercise of its governmental power, has no

right to impose upon agriculturalists the performance of jury or patrol duty, or militia service; nor can it tax the property, or impress it for public use. The principle is inexorable, and, where it applies, does not admit of the slightest interference by the State. Upon the argument made, a law of congress, placing the entire male agricultural population, not in the army, under such bonds as are prescribed in the act of 17th February, 1864, would annihilate the State government, by depriving it of the means necessary to the performance of its functions. Teeming with a negro population, it would have no militia, with which to suppress insurrections. With a constitution cherishing trial by jury, it would be unable to find jurors to try questions of fact. And wickedness would set its laws at defiance, because it would have no military force to aid in executing them. It is permissible to invoke this extreme case, as the test of an argument, which touches the relations of the general government with the states, and which ought not to be maintained, unless it can stand through all the vicissitudes of the future. But it is not an extreme case. If the argument be true which places the class in question beyond the sovereignty of the State, there are probably, even now, localities in which it would be difficult to procure competent juries, or a militia force to execute the law and suppress insurrection.

I deny that the agriculturalists, who are exempted, are instruments employed by the government for the execution of its power to support armies. They have merely contracted to supply certain articles, which it was contemplated would be produced by the plantations. They are in no wise agents, or servants, or officers of the government. They labor for themselves, merely stipulating to sell on certain terms. They may violate their stipulations, and incur the penalty of a suit for damages, and of a revocation of their exemptions. The provisions, when made, do not belong to the government, until they are delivered, and the government is not even bound to take them. There is simply a contract, that it may accept them at its option; and the agriculturalists, after enjoying the exemption, may withhold them, or otherwise dispose of them, and drive the

390 ALABAMA.

The State, ex rel. Dawson, in re Strawbridge & Mays.

government to its action for breach of the contract. It depends upon the wishes of the government, and the fidelity of the agriculturalists to their contract, whether any of the products of the plantations go to the support of the army. These owners of slaves are no more agents, servants, or instruments of the government, than private individuals are of private persons to whom they have contracted to sell the products of their plantations on specified terms. If they are the instruments through which the government executes its powers, and therefore beyond State authority, then so is every man who has a contract with it. There is no case or principle, in my opinion, which goes thus far. On the contrary, the supreme court of the United States, in *McCulloch v. Maryland*, expressly disclaim all intention to deny the authority of a State to tax a bank within the jurisdiction of the State, which, under a contract with the general government, might perform its fiscal operations for it.

Really, the instrument, or means, which the government, under the act of congress, employs to procure a supply of provisions, is the contract with the agriculturalists. It exacts no service from them. They voluntarily accede to a proposition made through the act of congress, and, in doing so, become parties to a contract. This contract is the means used by the government. The skill, industry, and property of the agriculturalists, are the means which he uses to execute the contract on his part.

To enable the agriculturalist to execute the contract, the government exempts him from its military service; and, as a guaranty for its performance, the law prescribes a forfeiture of the exemption as a penalty for abandoning the agricultural occupation. This does not change the *status* of the party into the position of a mere instrument or agency of the government. It is simply a cumulation of securities for the performance of the contract, and a provision for the determination of the exemption, when the reason for it ceases.

It is said, that the imposition of militia duty by the State causes an abandonment of the occupation, for a time at least, which involves a breach of the contract, and a

forfeiture of the exemption. It is argued, that the State cannot claim the service of its militia-man, because, if it does, the Confederate government will subject him to its military service, and therefore he must be exempt from militia duty. This argument is indefensible. It maintains a claim to exemption from militia duty, not because the man is in the military service of the Confederate States, but because he will be put into it if required to do military duty.

But is it true, that the employment by the State, in its militia, of those citizens who have been exempted by the Confederate States, terminates the exemption? The Confederate States, as a body, has the power of making contracts within the sphere of its constitutional authority.—*U. S. v. Tingey*, 5 Peters, 128 ; *U. S. v. Lane*, 3 McLean, 365. When that government resorts to contracts, as a means of executing its powers, it must be understood to enter into them with reference to the existing laws, and to the powers of the State government, within whose jurisdiction they may be made. Thus far, no distinction can be drawn between the general government and a natural person. The laws of the State, and the principles which govern the relation of the citizen to the State, silently incorporate themselves into contracts. Upon this doctrine, a covenant for the quiet enjoyment of land for a term of years is not broken, if the land be taken by the State for public use. *Bailey v. Miltenberger*, 31 Penn. St. 37. So, although the contract of the exempted agriculturalist may require the devotion of all his time to his occupation, yet this must be understood in reference to the claim of the State to his services in the militia, and in the various capacities in which the State has a right to command the services of its citizens. I think it is well settled, that the contracts of the government are, with certain exceptions pertaining to the remedy, to be interpreted and controlled by the laws which govern the contracts of natural persons.—*United States v. Canal Bank*, 3 Story, 79 ; *United States v. Bank of Metropolis*, 15 Peters, 392 ; *Cotton v. United States*, 11 How. 229 ; Story on the Const. § 1330. The contract of the agriculturalist must be understood to have been entered into in reference

to his liability to render military service to the State; and if the government of the Confederate States should carry out the true spirit of the contract, it would not claim a forfeiture of the exemption in consequence of the diversion from the agricultural occupation to perform militia duty at the call of the State in the case of an invasion.

I cannot think that the mere making of a contract by the general government with a citizen of a state, the performance of which might require all his time, can absolve him from the duties of citizenship; and in this I am supported, not only by the reasoning which I have adduced, but by the decision of the supreme court of Massachusetts in the case of *Melcher v. City of Boston*, 9 Metcalf, 73.

I next proceed to consider the argument, that the exempted owners and overseers are freed from military duty by our State legislation. On the 29th August, 1863, it was enacted by the legislature, that "all overseers, who are, or shall be, detailed under acts of the Confederate congress, so long as they shall be exempted or detailed as such," shall be exempt from service in the militia in this State. Overseers, in our slaveholding states, compose an industrial class, well defined, and distinctly recognized. In the popular acception of the term, overseers, as a class, are persons who superintend and manage the slaves of others, and direct their labors; and are contra-distinct from owners, who manage their own slaves. In this sense, the term is used in the statutes and judical decisions of this State, and in the acts of congress. —Code, part 1, title 13, chap. 4, art. 1; *Gilliam v. Senter*, 9 Ala. 395; *Martin v. Everett*, 21 Ala. 375; Acts of Congress of 11th October, '62, and 17th February, '64.

No other persons than such as belong to this distinct class of overseers can be exempted from military duty, under the laws of Alabama. The act of congress of 17th February, 1864, provides for the exemption, upon the giving of a prescribed bond, of the "owner, and manager, or overseer," of fifteen able-bodied hands between sixteen and fifty years of age. If, then, the act of the legislature of 29th August, 1863, applies to exemptions under acts of congress passed after its adoption, and relieves from militia

duty overseers who are exempted from the military service of the Confederate States under such acts, we have the strange and unreasonable result, that the overseer of fifteen hands is exempted from military service, while the like immunity is denied to one who as owner and manager discharges the same duty, and occupies the same position in contributing to the production of an adequate supply of provisions. A construction of the statute leading to such a result ought to be avoided, if it can be done consistently with the rules of interpretation.

On the 29th August, 1863, when the Alabama exemption law was adopted, there were two acts of congress, under which exemptions of overseers might have been had. The act of congress of 11th October, 1862, after exempting from military service sundry classes, proceeds as follows: "And such other persons, as the president shall be satisfied, on account of justice, equity, or necessity, ought to be exempted, are hereby exempted from military service in the armies of the Confederate States." Although a part of this act of 11th October, 1862, was repealed by the later act of May 1st, 1863, yet the clause above quoted was permitted to remain, and was in force when the Alabama exemption act of 29th August, 1863, was passed. On May 1st, 1863, an act of congress was adopted, which allowed an exemption to overseers on the plantations of minors, lunatics, *femes sole*, and persons absent in the military or naval service, where there were twenty slaves. The clause of the act of congress of 11th October, 1862, above quoted, and the act of May 1st, 1863, above noticed, are the laws of the Confederate States, under which an exemption of overseers from the military service of the Confederate States might have been had on the 29th August, 1863, when the Alabama law prescribing the exemptions from militia duty was passed. Under the former of those acts of congress, no exemption of an overseer could be had, unless the presence of peculiar circumstances of "justice, equity, or necessity," demanded it, and procured the grant of it by the president. Under the latter of those laws, no person was exempted, except the overseers of persons who, by reason of infancy, sex, insanity, or absence in the mili-

tary or naval service, were regarded as incapable of managing twenty slaves; and for the exemption the price of five hundred dollars was exacted. To the extent to which overseers might have been exempted under those acts of congress, there was an evident propriety, and an obvious justice, as well as good policy, in distinguishing among agriculturalists, and selecting the overseers for exemption. The process of exemption under those acts of congress was probably in operation—certainly capable of operation—when the Alabama act of militia exemption was passed. Men had then been exempted under those acts, and might still be exempted.

I think, when the Alabama legislature, on the 29th August, 1863, declared an exemption in favor of " all overseers, who are, or shall be, exempted or detailed under acts of the Confederate congress, so long as they may be exempted or detailed as such," it had reference to the two acts of congress above noticed, under which alone, at that time, exemptions of overseers from the military service of the Confederate States could be obtained. The act, in my opinion, meant to exempt " all overseers, who are, or shall be, exempted or detailed under the [existing] acts of the Confederate congress."

Of all persons engaged in agriculture, the only persons specifically exempted were overseers. The only justification for this partial legislation is restricted to overseers of persons incompetent to manage their slaves, and to such as might, from justice or necessity, be exempted by the president. If the legislation of the State be referred to the same acts of congress, it has the same reason and justification to support it. It is to be presumed, that the act of congress exempting overseers of minors, *femes sole*, lunatics, and persons absent in the military or naval service, under which the great mass of exemptions of overseers was made, was especially in the view of the legislature; and if the State law be understood to refer especially to that act, it has a substantial justification. But, if it be understood that the legislature have committed themselves to the exemption of a selected class engaged in agriculture, to the exclusion of all others, without any qualification or restric-

tion excusing or justifying the discrimination, it becomes a
piece of odious class legislation, utterly indefensible.    If the
legislature intended to exempt from militia duty all over-
seers who might by subsequent acts of congress be ex-
empted from the military service of the Confederate States,
it has done the very absurd and odious thing of saying that,
if the Confederate States shall exempt from its service all
agriculturalists of certain description, the State will select
from those agriculturalists the overseers, and vouchsafe to
them alone an exemption from its service.

The act of the legislature, being construed to apply to
overseers who might be exempted under subsequent acts
of congress, involves a surrender of the legislative dis-
cretion as to a matter of the highest importance.    It is
certainly the province of the legislature to say, who shall
be exempt from militia service ; but, if they have exempted
all overseers who might by any subsequent act of congress
be exempted from the Confederate service, they have sub-
stituted the will and discretion of a future congress for
their own, upon the question as to what overseers should
be free from militia service.    They have, in effect, delegated
their power, *quoad hoc,* to the congress of the Confederate
States ; and this delegation would be the more unreason-
able, because the congress would not act in reference to the
interests of the State, and its legislation with a view to the
interests of the Confederate States would be made to gov-
ern an important legislative policy of the State.

My conclusion from what I have said is, that a construc-
tion of the act of the legislature which would make an
exemption under a subsequent law of overseers from service
in the army of the Confederate States, control and measure
the exemptions under the State law from militia duty,
would lead to unreasonable and unjust results, and would
involve the abandonment of that discretion and judgment
upon a question of important State policy, which it is the
province of the legislature to exercise.    At this point I
invoke certain rules of construction as guides which are to
be followed in the interpretation of statutes.    "Such a con-
struction ought to be put upon a statute as may best
answer the intention the makers had in view."—*Tonnelle v.*

*Hall,* 4 Coms. 140. And in language used by this court many years ago, "the inartificial manner in which many of our statutes are framed, the inaptness of expressions frequently used, and the want of perspicuity and precision not unfrequently met with, often require the court to look less at the letter or words of the statute, than at the context, the subject-matter, the consequences and effects, and the reason and spirit of the law, in endeavoring to arrive at the will of the law-giver."—*Thompson v. State,* 20 Ala. 54. Constructions which lead to absurd or unreasonable results are to be avoided.—*Sprowl v. Lawrence,* 33 Ala. 674. Lastly, "statutes which strip the government of any portion of its prerogative, or give exemption from a general burden, should receive a strict interpretation.—*Academy of Fine Arts v. Philadelphia County,* 22 Penn. St. R. 496. And so strict is the rule, which inclines against constructions that yield any of the powers of government, that an eminent judge in Pennsylvania remarked, in reference to charters of corporations, by which the State disarms itself of any of its powers, that "in the construction of a charter, to be in doubt is to be resolved; and every resolution which springs from doubt, is against the corporation."—*Pennsylvania R. R. Co. v. Canal Commissioners,* 21 Penn. St. R. 9.

If the State law be allowed to effect an exemption from militia service of all overseers, to whom an exemption should be granted by a subsequent congress, we have an unreasonable result, a bestowment of the favor of exemption altogether partial as between classes similarly situated, and not probably intended by the legislature; and we have an unreasonable surrender of the legislative power of the State to determine what overseers shall be exempt. The application of the rules above laid down, against such an construction, is obvious and conclusive, if this be a case for construction at all. If a statute be plain and unambiguous in its terms, the judicial duty is to follow it, without regard to its reasonableness or consequences. But the law which we are examining is not of that character. I here reproduce so much of its words as are necessary to the comprehension of the argument, as follows: "All overseers, who are, or shall be, exempted or detailed under acts of

the Confederate congress." I have shown that there were subsisting acts of congress, under which overseers might be exempted at the date of the State law, and also that overseers might be afterwards exempted under the subsisting acts of congress. The supposition that the legislature referred to exemptions under existing acts of congress, harmonizes with the feature, that the law should embrace overseers afterwards exempted. The law is simply silent upon the question, whether the acts of congress meant were existing acts, or subsisting and future acts. Consistently with the words of the statute it may be either way. Here, then, is a case of such uncertainty and ambiguity as demands judicial construction; and the application of the rules which I have invoked, leads me to regard the law as relating alone to existing acts of congress.

It is said, however, that the State law employs the plural, "*acts*," when there was but one existing act of congress under which exemptions could be made. This is a mistake. Besides the act of May 1st, 1863, there was, as we have seen, an unrepealed clause of the act of congress of October 11th, 1862, under which exemptions of overseers might have been granted, when our militia law was passed on the 29th August, 1863.

But it is also said, that the law of militia exemption relates also to detailed overseers; that there was no act of congress authorizing the detail of overseers; and that the legislature must have contemplated future acts of congress, because it could only be by a future act that a class of detailed overseers could be produced. Details and exemptions are distinguishable terms. Details are men in the army of the government, who, remaining in the army, are assigned temporarily to some duty. Exempts are out of the army, and free from liability to service in it. Detailed men, being in the army of the Confederate States, could not owe service in the militia, and the State could not treat them as militia-men. Therefore, the exemption in our militia law is a mere supererogation. It is an exemption from the militia of men who do not, and cannot, belong to the militia. The use of the word "detailed" in the law is probably attributable to a confounding of the two words,

"exempted and detailed," which, however strange it may be, seems to have become quite common, and to have crept into print; and may even be found in joint resolutions in relation to the increase of the army of the Confederate States, passed by the legislature on the 29th August, 1863. The word "detailed," in our statute, is, therefore, simply supererogatory, and has no effect in any way, and can exercise no control over the construction of the law.

I am constrained by the reasons adduced above to hold, that the exemption of overseers from militia duty is limited to those overseers who were exempted from service in the army of the Confederate States, by acts of congress then in force, and does not apply to those who have been exempted under subsequent acts.

It is shown in this case, that the applicant had done everything required to be done by him in order to consummate the exemption, and that some four or five months had elapsed. The record is entirely silent, as to the approval of the bond. I think, after the lapse of so long a time, and in the absence of all proof to the contrary, we must presume that the bond was approved. What would be my decision, if it appeared that the bond had not been approved, it is not necessary now to inquire. Presuming the bond to have been approved, the petitioner must be regarded as exempt from the military service of the Confederate States, and liable to militia duty; and such is the opinion of the majority of the court. Judgment conformable to that opinion must be rendered.

STONE, J.—The constitution of the Confederate States (article I, section 8, subdivision 16) empowers congress "to provide for organizing, arming, and disciplining the militia," &c. Subdivision 15 confers on congress the power "to provide for calling forth the militia, to execute the laws of the Confederate States, suppress insurrections, and repel invasions." Subdivision 12 gives power "to raise and support armies."

The constitution of the State of Alabama, under the title "militia," contains the following provisions: "Sec. 1. The general assembly shall provide by law for organizing and

disciplining the militia of this State." "*Sec.* 3. The governor shall have power to call forth the militia, to execute the laws of the State, to suppress insurrections, and repel invasions."

In the case of *Ex parte McCants*, (in MSS.,) I briefly stated what I conceive to be the true definition of the term *militia*, as found in the 16th clause of the 8th section of the 1st article of the Confederate constitution. "It does not mean that body of men, organized under State authority, who are known as State militia." It cannot speak of an organization already formed, for the clause expressly confers on congress power to provide for *organizing* them. It would be nonsense to speak of organizing a body of men already organized. It means *the arms-bearing population*—those *capable of bearing arms*—in their unorganized state. These the constitution makes provision for "organizing, arming, and disciplining."

The congress of the Confederate States is also empowered to raise armies.—Subd. 12. The persons out of whom congress may raise armies, and who under the authority of that legislative body may be organized, armed and disciplined as militia-men, are the identical persons who make up the citizens of the several States composing the Confederacy.

In like manner, section one of the State constitution, under the title "*militia*," must refer to the same unorganized *arms-bearing population;* for it confers the power to "provide for organizing and disciplining the militia of this State." Each constitution confers the power of calling forth the militia ; the Confederate constitution, when it may be necessary to execute the laws of the Confederate States, to suppress insurrections, and to repel invasions ; the State constitution, "to execute the laws of the State, to suppress insurrections, and repel invasions." The powers conferred by the Confederate constitution are to be exercised by the president of the Confederate States ; while those conferred by the State constitution are to be exercised by the governor of the State. In cases of resistance to the execution of the laws, of insurrection, or of invasion, the executive of each government is the sole judge of the exi-

gency which renders a call upon the militia necessary, and of the number of militia-men necessary to meet the exigency; and one government cannot be dependent on the other for the exercise of this power and discretion, nor accountable to it for the manner of their exercise. Within the bounds of the militia organization which each government has prescribed, each executive has full power of determining to what extent it may be necessary to call out the militia, to execute the laws, suppress insurrection, or to repel invasion.—See *Ex parte Hill,* 38 Ala. 429, 458. See, also, for an elaborate discussion of this doctrine, *Houston v. Moore,* 5 Wheat. 1, 50-1-2. Under the operation of this principle, it may happen that most, or all, of the arms-bearing population, may be called into the service.

It being thus shown that the Confederate government has unlimited power over the arms-bearing population, in raising armies, or in calling out the militia under the Confederate constitution; and the State government has like unlimited power to call out the militia under the State constitution, it is within the range of possibility that each government may claim the military services of one and the same person at the same time. No one person can, at the same time, perform active military service for both governments. His whole time and energies being employed in the one service, he has none to devote to the other. In such case, the question arises, which government has the paramount claim? The constitution of the Confederate States (article 6, § 3) answers the question. Its language is: "This constitution, and the laws of the Confederate States made in pursuance thereof, * * * shall be the supreme law of the land." The laws of congress for raising an army, and the laws for organizing the militia, and giving authority to call them out, to execute the laws of the Confederate States, suppress insurrections, and repel invasions," are made in pursuance of the constitution of the Confederate States, and are therefore the supreme law of the land. The State law, though constitutional, if it cannot have operation without coming in collision with the act of congress thus constitutionally enacted, must, for the time, yield the precedence to this supreme law. Such the constitution expressly declares, and we must all obey.—See *Houston v. Moore, supra.*

The constitution of the Confederate States confers on congress the same power to support armies, as it does to raise armies; and in this grant of power there is necessarily implied the power to employ the means that may be necessary and proper to carry this granted power into effect.—See *Ex parte Hill, supra.* The army cannot be supported, if the whole male population be abstracted from industrial pursuits. To support the army, then, it is necessary and proper that the agricultural and mechanic interests be fostered and strengthened. The army must be fed and clothed, or it cannot fight the battles of the country. There can, then, be no doubt, that the Confederate government may detail, or otherwise employ, any portion of the arms-bearing population, whose services may be necessary to the support of the army. Persons thus detailed or employed owe, and are performing, service to the Confederate States, constitutionally exacted; and cannot be lawfully hindered in the performance of such service, by the exercise of the right in the State to call out the militia. But mere exemptions from military service by the Confederate States, or those exemptions which are purchased and paid for at a stipulated price, if there be nothing more in the transaction, have in them none of the properties of a detail, and do not come within this rule.

To apply these principles: Persons employed in government service, or detailed in government employ, while so employed, are not subject to militia duty at the call of the State; but persons who are exempt from Confederate service, either absolutely, or upon a simple commutation, are liable to State militia service.

The exact question in these cases arises under the 4th subdivision or article of the 10th section of the act of congress, approved February 17th, 1864, " to organize forces to serve during the war." It provides, that " there shall be exempt one person as overseer or agriculturalist, on each farm or plantation, upon which there are now, and were on the first day of January last, fifteen able-bodied field hands, between the ages of sixteen and fifty, upon the following conditions :

"1. This exemption shall only be granted in cases in which

there is no white male adult on the farm or plantation not liable to military service, nor unless the person claiming the exemption was, on the 1st day of January, 1864, either the owner and manager, or overseer of said plantation; but in no case shall more than one person be exempted for one farm or plantation.

"2. Such person shall first execute a bond, payable to the Confederates States of America, in such form, and with such security, and in such penalty as the secretary of war may prescribe, conditioned that he will deliver to the government, at some railroad depot, or such other place or places as may be designated by the secretary of war, within twelve months next ensuing, one hundred pounds of bacon, or, at the election of the government, its equivalent in pork, and one hundred pounds of net beef (said beef to be delivered on foot), for each able-bodied slave on said farm or plantation, within the above said ages, whether said slaves work in the field or not; which said bacon or pork and beef shall be paid for by the government at the prices fixed by the commissioners of the State under the impressment act: *Provided,* that when the person thus exempted shall produce satisfactory evidence that it has been impossible for him, by the exercise of proper diligence, to furnish the amount of meat thus contracted for, and leave an adequate supply for the subsistence of those living on said farm or plantation, the secretary of war shall direct a commutation of the same, to the extent of two-thirds thereof, in grain or other provisions, to be delivered by such persons as aforesaid at equivalent rates.

"3. Such person shall further bind himself to sell the marketable surplus of provisions and grain now on hand, and which he may raise from year to year while his exemption continues, to the government, or to the families of soldiers, at prices fixed by the commissioners of the State under the impressment act."

Said article or subdivision contains other provisions in regard to the bond; but they are not material to the consideration of the question before us.

Looking alone to the provisions of the act of congress, copied above, it is impossible to resist the conclusion, that

the exemption was granted, not as a boon to the overseer or agriculturalist, but in promotion of the policy of the government, to secure support to the army, and to the families of soldiers. No matter how many slaves there may be on the plantation, there is no exemption, either to the owner or overseer, if there be on the plantation a white male adult not liable to military service; and even then the exemption is withheld, unless the person who asks it was the *owner and manager, or overseer of said plantation, on the first day of January*, 1864. Skill, and fitness for the management of slaves, and development of the agricultural resources of the country, were the ends aimed at; and these ends were proposed to be accomplished, not simply, or even mainly, for the benefit of the country generally, but for the purpose of feeding the army and the families of soldiers. Two hundred pounds of meat to be furnished to the government, for each able-bodied hand between the ages of sixteen and fifty, and the marketable surplus of grain and provisions on the plantation, or to be produced, sold to the government, or to soldiers' families; and all this at prices fixed by commissioners. These provisions clearly prove, that the control and profitable employment of the slave-labor of the country were the objects of the enactment; and that this labor should be made tributary to the prosecution of the giant war in which we now are engaged.

But we are not left to conjecture, or doubtful construction, in ascertaining the aim and object of congress. The bond, when entered into, becomes alike the contract of the Confederate government, and of the makers of the bond. Each has a clear right to stand on the terms of his contract; and especially can the sureties claim that their principal shall not be molested, hindered, or obstructed, in an honest and faithful effort to comply with the obligations of his bond. He (the principal) binds himself to deliver to the government two hundred pounds of meat, for each hand employed; and the sureties are liable for damages, if he fail to do so. The Confederate government can do no act which will hinder or obstruct the bonded agriculturalist in the performance of his contract; and if it does so, it thereby

absolves both principal and sureties in the bond, at their option, from their obligation to perform. The very words and policy of the act of congress furnish unmistakable evidence that the personal presence and supervision of a skillful owner or overseer are necessary to the successful prosecution of the planting interest; and if the Confederate government, by its act, violates the contract, and takes away the owner or overseer, the contract is broken on one side, and this excuses a breach on the other. Now, if the Confederate government, having the constitutional right to the services of each able-bodied citizen in the field as a soldier, or to aid in the support of the army, has lawfully, and for a consideration, parted with the first of these rights to carry out the second, and bound itself not to molest or disturb a particular citizen in his accustomed pursuit; can it be possible that the State government can claim the services of such citizen, and thus deprive the Confederate government of the benefits to accrue from the bond, or deprive the citizen of his own liberty, skill, and energy, so necessary to the performance of his contract? Can it be that there rests at one and the same time, and on one and the same citizen, the duty to the Confederate government of giving his personal attention and skill to the production of grain and provisions on his plantation, and to the State government of serving in its militia away from his plantation? No man can serve two masters; and, in the case supposed, which master can assert the paramount claim? " The laws of the Confederate States made in pursuance [of the Confederate constitution] shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."—Constitution Conf. States, Art. 6, § 3.

But the argument is much stronger than this. The act of congress under which the overseer or agriculturalist, with his sureties, enters into bond, secures to him the right of showing, by " satisfactory evidence, that it has been impossible for him, by the exercise of proper diligence, to furnish the amount of meat thus contracted for, and leave an adequate supply for the subsistence of those living

on said farm or plantation," &c.; and thus obtain a commu-
tation of the same, to the extent of two-thirds thereof,
in grain or other provisions. The stipulation clearly proves,
that the Confederate government contracts for "proper dili-
gence" on the part of the overseer or agriculturalist, in the
production of the stipulated quantity of meat; and if the
maker of the bond, after employing proper diligence, can
show that it was impossible for him to produce and furnish
the amount contracted for, then all the obligors have the
clear right to insist on the stipulation securing to them the
right to commute. Now, if the overseer or agriculturalist
has not given his attention and skill to the management of
the plantation, then it is not possible for him to show, "by
satisfactory evidence, that it has been impossible for him,
by the exercise of proper diligence, to furnish the amount
of meat thus contracted for." Hence, he can not claim the
privilege of commuting as to the two-thirds, unless the act
of the State can absolve the makers of the bond from their
lawful contract with the Confederate government, to furnish
provisions for the support of its armies. The act of con-
gress being constitutional, and being the supreme law of
the land, of course State legislation can not overrule it. As
the State, then, can not absolve the maker of the bond
from his liability to the Confederate government, the advo-
cates' of the theory I am combating are driven to the other
horn of the dilemma—namely, that though the power and right
of the Confederate government to impose on the citizens
the burdens specified in the bond, can not be gainsaid; and
though the State can not absolve the makers from the
penalty of their bond; yet the State, by its direct inter-
ference, can deprive the citizen of the power of performing
his contract, and can take away from him one of the most
valuable rights secured to him under the bond—the right,
in a certain contingency, to commute as to two-thirds of
the meat.

But the following view of this question is conclusive. If
these applicants are exempt from military service in the
armies of the Confederate States, they are exempt as over-
seers or agriculturalists under the 4th article of the 10th
section of the act of congress, approved February 17th,

1864, having complied with the terms of the act by giving bond. In the same act of congress—that of February 17th, 1864—is the following *proviso*, being the last clause of the 10th section of that act: "*Provided*, that the exemptions granted under this act shall only continue whilst the persons exempted are actually engaged in their respective pursuits or occupations." This clause, in terms, embraces all exemptions granted by and under the act approved February 17th, 1864. Now, if the overseer or agriculturalist, thus exempted, becomes thereby liable to the performance of militia service, and is taken as a State militia-man, and placed in the service, he immediately forfeits his exemption from service in the armies of the Confederate States, because he ceases to be "actually engaged" in the "pursuit or occupation," on account of which he obtained his exemption. He must then be taken from the militia of the State, and placed in the army of the Confederate States. The argument is, then, reduced to this: The overseer or agriculturalist is liable to militia service, only because he is actually engaged in his particular pursuit or occupation, and therefore exempt from service in the Confederate army. When, however, the State asserts this right to place such overseer or agriculturist in its militia service, it thereby forfeits its right to his service; for the overseer or agriculturalist loses his exemption from Confederate military service, by ceasing to be "actually engaged" in his pursuit or occupation; and by the same act, ceases to be liable to militia service. To state such a proposition, is to demonstrate its absurdity.

If it be urged, in answer to this view, that the overseer or agriculturalist, though absent from home in the performance of militia service, is still "actually engaged" in his pursuit or occupation, within the meaning of the act of congress; the answer is, first, that such is not the meaning of the word *actually*. It means *in fact—really—in truth*. In legal parlance, the word *actually* is used as the antithesis of the word *constructively*. We speak of actual possession—*pedis possessio*—and constructive possession. Actual possession is where the thing is in the immediate occupancy of the party; constructive possession is where one claims

to hold by virtue of some title, without having the actual occupancy; as, when the owner of a lot of land, regularly laid out, is in possession of any part, he is considered constructively in possession of the whole.—*Hubbard v. Austin,* 11 Verm. 129.

Besides, the language of the *proviso* is, "that the exemptions granted shall only continue while the *persons* exempted are actually engaged," &c. It does not say, while the *slaves* in his employ are actually engaged. Exemption is a personal privilege, conferred, not in consideration of the ownership of the slaves, as I have heretofore shown, but in consideration of the meat to be furnished, the employment of fifteen or more able-bodied field hands in the production of grain and provisions, to be sold at prices fixed by the commissioners for the State, and in the fact that the person exempted, the overseer or agriculturalist, is to be and remain actually engaged in his pursuit or occupation.

Again, if overseers and agriculturalists, who are taken from home and placed in the State militia service, are still *actually engaged* in the pursuit or occupation an account of which they procured their exemptions, because their hands are still thus employed; then it follows that no bonded overseer or agriculturalist is bound to remain on his plantation, provided his hands continued to labor on the plantation. On this hypothesis, the overseer or agriculturalist might be absent from the Confederate States on business or pleasure, and the terms of the exemption would not be violated, or the privilege forfeited. Those who contend that the person exempted, though absent from the plantation on militia duty, for a period no matter how long, are still actually engaged in the pursuit or occupation of overseer or agriculturalist, are forced to admit this. Can this be the meaning of the act of congress?

The second paragraph of the 4th article or subdivision of the 10th section of the act approved February 17th, 1864, authorizes the secretary of war, under the direction of the president, "to grant exemptions or details, on such terms as he may prescribe, to such overseers, farmers, or planters, as he may be satisfied would be more useful to the country in the pursuits of agriculture than in the mili-

tary service." This clause was inserted to allow, in the discretion of the executive government, the exemption or detail of overseers or agriculturalists, who had under their control a force less than fifteen able-bodied field hands. Under this clause, many persons having less than fifteen hands have been exempted from service in the armies of the Confederate States. This class is clearly exempt from militia service, for the act declares the exemption shall cease, "whenever the farmer, planter or overseer shall fail diligently to employ, in good faith, his own skill, capital and labor exclusively in the production of grain and provisions to be sold to the government," &c. Now, can it be supposed that the Confederate government intended to appropriate exclusively to the support of its armies, and the families of soldiers, the skill, capital, and labor of these small farmers, planters, and overseers, while it left free to other uses the skill, labor and experience of the overseers or agriculturalists on the the larger plantations, from which it must derive the chief support of its armies?

I hold that the provisions of the act of February 17th, 1864, which relate to overseers and agriculturalists, although they style it an exemption, clog it with terms and conditions which impart to it more the character of a detail than an exemption; and that bonded overseers and agriculturalists are not subject to militia duty at the call of the State. This view of the question renders it unnecessary that I should inquire whether the petitioners, Mays and Strawbridge, are to be regarded as merely furloughed soldiers in the service of the Confederate States, or as bonded overseers under the 4th subdivision of the 10th section of the act of congress. In either case, they are, in my opinion, not subject to State militia service, and were properly discharged. I need not inquire the meaning of our own act, which exempts from militia service, called the second class, "all overseers who are, or shall be, exempted or detailed under acts of the Confederate congress, so long as they may be exempted or detailed as such."