## JENKINS PETROLEUM PROCESS CO. v. CREDIT ALLIANCE CORPORATION et al.

### No. 1328.

Circuit Court of Appeals, Tenth Circuit.

April 11, 1936.

C. Stanley Thompson, of Washington, D. C. (William J. Donovan, of Washington, D. C., Samuel J. Montgomery, of Tulsa, Okl., and Frederick Schafer, Carbery O'Shea, Russell Jewell and Donovan, Bond & Leisure, all of Washington, D. C., on the briefs), for appellant.

George S. Ramsey, of Tulsa, Okl. (Alfred McKnight, of Fort Worth, Tex., and E. E. Berkwit, of New York City, on the brief), for Credit Alliance Corporation and others.

Nathan A. Gibson, of Tulsa, Okl. (James H. Maxey, Wilbur J. Holleman, Harry Campbell, and Valjean Biddison, all of Tulsa, Okl., on the brief), for Beckett Co., Inc., and others.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

PHILLIPS, Circuit Judge.

This is an appeal by the Jenkins Petroleum Process Company, hereinafter called Jenkins, from an order denying it leave to intervene in a suit brought by Credit Alliance Corporation and Graver Corporation, hereinafter referred to as Credit Alliance and Graver, respectively, against Beckett Company, Inc., Western Oil Corporation, Travis-Senter Refining Company, hereinafter referred to as Beckett, Western and Travis-Senter, respectively, and J. F. Darby, C. F. Lynde, J. R. Travis, I. H. Patton, Jr., Carl Pursel, and G. W. Snedden.

Graver is a corporation organized under the laws of Illinois and is duly authorized to transact business in Oklahoma. Credit Alliance is a corporation organized under the laws of New York. Beckett is a corporation organized under the laws of Nevada and authorized to transact business in Oklahoma. Western is a corporation organized under the laws of Delaware and is authorized to transact business in Oklahoma. Travis-Senter is a corporation organized under the laws of Oklahoma. Jenkins is a corporation organized under the laws of Wisconsin.

The shares of stock of Beckett consist of twenty shares, each of the par value of $25.00, and were owned by Travis, Lynde, Darby and G. W. Snedden until about May 1, 1932.

The shares of stock of Western are owned by Darby, Lynde, G. W. Snedden's estate and Darby-Lynde Corporation. The shares of stock of the latter corporation are owned by Darby and Lynde.

The shares of stock of Travis-Senter, except directors qualifying shares, are owned by Travis.

On February 15, 1928, Graver entered into a written contract with I. H. Patton, Jr., hereinafter referred to as the Graver contract, whereby it agreed to erect and install at Duncan, Oklahoma, one Jenkins cracking plant and auxiliary equipment, hereinafter referred to as the cracking plant for a consideration of $172,818, to be paid by Patton or his successor.

It provided that title to the cracking plant should remain in Graver until the entire purchase price was paid and that payment therefor should be made out of profits of the cracking plant in monthly installments of $9,601 each, evidenced by promissory notes.[1]

---

[1] The Graver contract in part read as follows:

"Upon completion of the plant and upon its being turned over to you as described under paragraph entitled 'Guaranteed Capacity' the entire amount of the contract price shall be paid by a series of eighteen (18) notes each, each one being in the amount of Nine Thousand Six Hundred and One Dollars ($9,-601.00). These notes shall bear no interest. The first of these notes shall mature thirty (30) days after their date and one each succeeding month. These notes are to be met out of the profits from operating equipment sold under this contract, the full profits for each month being paid against these notes. Should the profit in any month be less than the face of the note, the amount of

On June 14, 1928, Patton assigned his interest in the Graver contract to Beckett. Graver completed the cracking plant in accordance with such contract and the specifications and Beckett accepted it. It was put in operation December 1, 1928.

On March 1, 1928, Graver, in order to secure a loan and future advances, transferred and assigned all its right, title and interest then due or to become due to it under the Graver contract to Credit Alliance. Beckett executed and delivered the notes provided for therein to Graver and the latter endorsed and delivered them to Credit Alliance.

Travis-Senter owns a plant for refining crude oil into gasoline, particularly the top or first run distillates, on premises owned by it, situated adjacent to the cracking plant of Beckett. The premises on which the cracking plant is situated are also owned by Travis-Senter and are leased from it by Beckett. Western is a producer of crude oil in Oklahoma. In 1928, the Travis-Senter leased its refinery to the Western under a contract which provided that J. R. Travis should be in charge of the Western's refinery operations and its sale of products, that the Western should supply the refinery with working capital and crude oil; and that all the profits derived from the operations of the refinery should be divided equally between the Travis-Senter and Western.

Since the cracking plant began to operate, J. R. Travis has been the general manager of Beckett and in control of its operations including local sales.

In June, 1928, Western and Beckett entered into a contract for the sale, by the former to the latter, of crude oil and other cracking material for the cracking plant.

Beckett reported profits to Graver from time to time and paid on the purchase price, $26,888.72, which, with a credit allowance of $1,500, left a balance at the time of the master's report, hereinafter referred to, of $144,429.28. Beckett had also paid to Graver $4,843.31, on the finance charge provision of the Graver contract.

From December 1, 1928, to May 1, 1932, there was an interchange of products between Beckett and Western, the former purchasing crude oil, gas oil, and cracking material, and the latter purchasing gasoline, gas oil, and fuel oil from Beckett. The individual defendants, through stock ownership during such period, dominated and controlled both Beckett and Western, and as stockholders, directors and officers of such corporations caused Beckett to pay the Western more than the reasonable price of products sold and actually delivered to Beckett and caused Beckett to sell products to the Western at less than the value thereof, and thereby fraudulently diverted to Western, profits of Beckett which should have been paid to Credit Alliance under the terms of the Graver contract and disabled Beckett to make its payments under such contract.

In their bill and supplemental bill, Credit Alliance and Graver set up the foregoing facts and prayed for relief as follows:

"(1) That a writ of injunction issue restraining the defendants from continuing the breach of said contract shown by Exhibit 'A'; (2) that if necessary at any

---

profits made are to be paid and the difference between this amount and the amount of the note shall be paid by a note for this amount due eighteen (18) months from the date of execution. Each note of this series of eighteen (18) is to be paid in a like manner. These renewal notes will carry no interest nor financing charges.

"The amount of profits earned monthly shall be determined by subtracting the actual cost of manufacture as outlined below from the value of the finished products manufactured by this equipment during the month, figured upon the average selling price for the month of the different grades of products made. The cost shall include the following items at their actual cost:

"Labor, fuel, power, steam, repair ma-

terial, repair labor, lime, treating costs, royalty, or royalties, taxes and insurance.

"Crude Oil and/or Topped Crude at the average monthly purchase price.

"In consideration of the above terms of payment you agree to pay us a running finance charge of five (5) cents on each and every barrel of gasoline manufactured by the apparatus covered by this proposal. This payment is to be governed by the terms and conditions specified in paragraphs 4, 5, 6, 7, 10 and 11 of the License Agreement where they apply between you and the Jenkins Petroleum Process Company except these payments are to be made directly to the Graver Corporation."

The license agreement was entered into between Jenkins and Patton and is hereinafter referred to more fully.

stage of this proceeding a receiver be appointed; (3) that a decree of specific performance be entered ordering and directing the Beckett to pay over to the plaintiffs each month the profits it derives for the preceding month from operating the Cracking Plant, as provided in the contract; (4) that the Beckett be ordered to account and pay over to plaintiffs all profits heretofore realized by it from operating said Cracking Plant and not heretofore paid to plaintiffs or either of them, and that for this purpose an accounting be stated; (5) that a judgment and decree be entered against the individual defendants, the Travis-Senter and the Western, requiring them to pay over to the plaintiffs a sum of money equivalent to all the profits they have caused to be diverted from the Beckett to the Western, and that an accounting be taken for the purpose of ascertaining said amount; (6) that an auditor or master in chancery be appointed with directions to examine the books and records of the defendants and take evidence such as the parties may offer and report to this court his findings of facts and conclusions of law necessary to the determination of the questions herein involved; (7) that the master be directed to report the amount due plaintiffs on account of the running finance charge of five cents on each barrel of gasoline manufactured by the Cracking Plant and that Beckett be ordered to pay same to plaintiffs and to hereafter continue such payments; * * *"

After the issues were joined, the cause was referred to a special master.

The time consumed in the hearings before the master aggregated twenty-seven days and the record thereof is embraced in five volumes, totaling 2,486 pages.

George W. Snedden, one of the original parties defendant died on June 18, 1934, and his executors, Geraldine H. Snedden and the First National Bank and Trust Company of Tulsa, were substituted as parties defendant.

On January 11, 1935, the master filed his report. The master found the foregoing facts, and further specifically found:

That on June 15, 1928, Western and Beckett entered into a contract whereby Beckett agreed to purchase from Western all the crude oil and other cracking material used in the cracking plant.

That on December 1, 1928, Western and Beckett entered into a contract whereby it was agreed the former should handle all the products of the latter.

That by reason of their stock ownership and official connection with the corporate defendants, the individual defendants controlled the corporate defendants and particularly the corporate defendants, Beckett and Western.

That during the period from December 1, 1928 to May 1, 1932, Beckett purchased "charging stock" [2] treated in its cracking plant from Western and that the amount thereof reflected on the invoices from Western to Beckett, exceeded the actual amount delivered 2,055,840 gallons, thereby causing a diversion of profits from Beckett to Western aggregating $35,324.-35.

That during the first two years of the period of operations under the contract of June 15, 1928, between Beckett and Western, the latter consistently charged Beckett unit prices for "charging stock" in excess of its value and in excess of what Western could have sold such material in the market, amounting in the aggregate to an overcharge of $93,657.67.

That during the period from December 1, 1928, to May 31, 1932, for products sold by Beckett to Western, the latter gave Beckett credit for $106,454.42 less than it was entitled to receive.

That the defendants wrongfully and fraudulently so diverted profits from Beckett to Western pursuant to a scheme to prevent Beckett from showing profits on its books payable to the plaintiffs under the Graver contract and to benefit themselves as the stockholders of the corporate defendants, other than Beckett, and that the profits so wrongfully diverted, amounted to $235,436.44.

That the defendants, Patton and Pursel, were not stockholders in the corporate defendants and did not participate in any of such profits.

That the evidence did not show the disposition of such profits other than that dividends in large amounts were paid by

[2] Charging stock is the residue of crude oil remaining after the lighter products have been distilled off through the ordinary methods of distillation in a skimming plant.

Western to its stockholders in 1929, 1930 and 1931.

And that by reason of the acts of the defendants and the diversion of such profits, plaintiff sustained a loss of $2,905.60 on the financing charge or royalty and the balance due on the contract price amounting to $144,429.28.

He concluded that the defendants, other than Pursel and Patton, breached their duty to plaintiffs and converted profits earned by Beckett under the terms of the contract of sale and were jointly and severally liable to plaintiffs in the sum of $147,334.88, and the costs of the proceeding, and recommended a judgment accordingly.

The evidence introduced before the master is not in the record. Our statement of facts herein is of necessity based on the pleadings and the findings of the master and is not intended, in anywise, to interfere with or prejudice the trial court in the performance of its duty to find the ultimate facts on the hearing on the master's report.

On April 22, 1935, Jenkins filed its motion for leave to intervene herein, accompanied by a petition of intervention and a bill of intervention. In its petition and bill of intervention, Jenkins alleged the commencement of the main proceeding on May 2, 1931 and the joinder of issue therein and summarized the allegations of the bill and supplemental bill therein. It alleged the reference to the special master and the facts found and conclusions made by the special master.

It further alleged these facts:

Jenkins is the owner of eight United States letters patent covering processes and devices for treating, distilling and refining crude petroleum oils.

From September 30, 1926, Graver was the exclusive licensee of Jenkins Company to sell within the United States, Jenkins' equipment to be constructed or operated under such patents. Such right of Graver was subject to the condition that a license agreement should be executed by the purchaser requiring the purchaser to pay Jenkins a royalty.

On February 15, 1928, Jenkins Company entered into a license agreement with I. H. Patton, Jr., who thereafter assigned it to Beckett.

Such agreement granted the right to use the devices and processes covered by the patents in the construction and operation of the cracking plant, and provided the licensee should pay Jenkins a royalty of twenty-five cents per barrel on each and every barrel of gasoline produced by use of any of such inventions during the lifetime of the license, or in lieu thereof a royalty of two cents per barrel on all charging stock treated by the devices or processes covered by such patents.

During the period from December 1, 1928 to April 12, 1932, Beckett at various times failed to pay Jenkins Company the royalty due under such agreement and Jenkins Company sued Beckett and obtained two judgments for royalties due it, one on September 4, 1931, for $39,670.56 with interest from that date and one on September 30, 1932, for $4,568.50 with interest from that date. Executions were first issued on these judgments on March 13, 1935 and they were returned nulla bona on March 18, 1935.

Jenkins Company further alleged that it had an interest in the litigation in the main proceedings, in that it is necessary to marshal the assets of the defendants, any judgment will affect its rights in and to the assets of Beckett improperly diverted by the other defendants, and such assets are impressed with a trust in favor of Jenkins Company and it has an equitable lien thereon, which because of its judgments against Beckett is prior to the claims of the plaintiffs.

Applications to intervene may be divided into two classes:

(1) Where the intervention is not indispensable to the preservation or enforcement of the right of the petitioner; and (2) where the petitioner has a direct interest in the subject matter of the pending suit which can be established, preserved or enforced only by intervention therein. In the first class, intervention is a matter resting in the discretion of the trial court and an order denying it is not final nor appealable. In the latter class, the right of intervention is absolute and an order denying it is final and appealable.[3]

[3] Demulso Corporation v. Tretolite Co. (C.C.A. 10) 74 F.(2d) 805, 807; United States v. California Co-op. Canneries, 279 U.S. 553, 556, 49 S.Ct. 423, 73 L.Ed. 838; Swift v. Black Panther Oil & Gas Co. (C.C.A. 8) 244 F. 20, 30; Credits Commutation Co. v. United States (C.C.A. 8) 91 F. 570, 573; Id., 177 U.S.

Here plaintiffs sought an accounting of the profits unlawfully diverted from Beckett, a decree requiring Western and Travis-Senter to pay over to plaintiffs an amount equivalent to the profits so diverted and requiring Beckett to specifically perform the Graver contract, and a judgment against Beckett for the balance due on the financing charge.

The master recommended a personal judgment against all the defendants except Pursel and Patton.

Plaintiffs did not seek to follow specific assets transferred from Beckett to Western and the other defendants and subject them to its debt. The main suit is not a creditor's bill to reach specific property or funds by a decree in the nature of equitable execution, but is purely a proceeding in personam for a personal judgment. Hence we fail to see how Jenkins has a direct interest in the subject matter of the pending suit which may be asserted or protected only by intervention therein. It is free to bring an action like this suit or a creditor's bill to reach specific assets.

But if this were a creditor's bill to reach specific property, we think Jenkins would be in no better position and the same result would follow. It is true the royalty payments to Jenkins along with other costs, were to be deducted from earnings of Beckett before profits could arise, payable under the Graver contract, but we find nothing in the license agreement which gave Jenkins a lien on Beckett's earnings. No execution was issued and levied on specific property under the judgment obtained by Jenkins against Beckett on September 30, 1932, within one year from the date of its rendition. The same is true of the judgment obtained by Jenkins against Beckett on September 4, 1931. Hence Jenkins has no lien on the assets of Beckett by virtue of such judgments superior to the claims of plaintiffs. Section 466, Okl.St.1931; Harris v. Southwest Nat. Bank, 133 Okl. 152, 271 P. 683, 685–687.

One creditor may prosecute a creditor's suit solely in his own behalf, and he acquires a lien as of the date of the filing of his bill superior to all liens subsequently acquired.[4]

In Freedman's Savings & Trust Co. v. Earle, 110 U.S. 710, 716, 4 S.Ct. 226, 229, 28 L.Ed. 301, the court said:

"It is to be noted, therefore, that the proceeding is one instituted by the judgment creditor for his own interest alone, unless he elects to file the bill also for others in a like situation, with whom he chooses to make common cause; and as no specific lien arises by virtue of the judgment and execution alone, the right to obtain satisfaction out of the specific property sought to be subjected to sale for that purpose dates from the filing of the bill. 'The creditor,' says Chancellor Walworth, in Edmeston v. Lyde, 1 Paige (N.Y.) 637–640 [19 Am.Dec. 454], 'whose legal diligence has pursued the property into this court, is entitled to a preference as the reward of his vigilance.' * * * As his lien begins with the filing of the bill, it is subject to all existing incumbrances, but is superior to all of subsequent date. As was said by this court in Day v. Washburn, 24 How. 352 [16 L.Ed. 712]:

"'It is only when he has obtained a judgment and execution in seeking to subject the property of his debtor in the hands of third persons, or to reach property not accessible to an execution, that

311, 317, 20 S.Ct. 636, 44 L.Ed. 782; United States Trust Co. v. Chicago Terminal Transfer R. Co. (C.C.A. 7) 188 F. 292, 296; Palmer v. Bankers' Trust Co. (C.C.A. 8) 12 F.(2d) 747, 752.

In Swift v. Black Panther Oil & Gas Co., supra, the court said:

"In intervention there are two classes of cases—one class in which the intervention is not indispensable to the preservation or enforcement of the claim of the petitioner, and there the permission to intervene is discretionary with the court; another class in which the petitioner claims a lien upon or an interest in specific property in the exclusive jurisdiction and subject to the exclusive disposition of a court, and his interest

therein can be established, preserved, or enforced in no other way than by the determination and action of that court."

[4] Freedman's Savings & Trust Co. v. Earle, 110 U.S. 710, 4 S.Ct. 226, 28 L. Ed. 301; Green v. Griswold, 57 N.Y.Super.Ct. 24, 4 N.Y.S. 8; Hammond v. Hudson River Iron & Mach. Co., 20 Barb. (N.Y.) 378; Rugely & Harrison v. Robinson, 19 Ala. 404, 419; Lucas v. Atwood, 2 Stew. (Ala.) 378; Seymour v. McAvoy, 121 Cal. 438, 53 P. 946, 947, 41 L.R.A. 544; 15 C.J. p. 1413, § 112. See, also, First Nat. Bank v. Flershem, 290 U.S. 504, 520, 54 S.Ct. 298, 78 L. Ed. 465, 90 A.L.R. 391; Spellman v. Sullivian (D.C.N.Y.) 43 F.(2d) 762, 764.

a legal preference is acquired which a court of chancery will enforce.'

"This is in strict accordance with the analogy of the law, as it was recognized that the judgment creditor who first extends the land by elegit is thereby entitled to be first satisfied out of it. It is the execution first begun to be executed, unless otherwise regulated by statute, which is entitled to priority. Rockhill v. Hanna, 15 How. 189-195 [14 L.Ed. 656]; Payne v. Drewe, 4 East, 523. The filing of the bill, in cases of equitable execution, is the beginning of executing it.

"The passage cited from the opinion in Day v. Washburn, supra, speaks of the preference thus acquired by the execution creditor as a legal preference. It was distinctly held so to be by Chancellor Kent in M'Dermutt v. Strong, 4 Johns.Ch.(N. Y.) 687. He there said: 'But this case stands on stronger ground than if it rested merely on the general jurisdiction of this court, upon residuary trust interests in chattels, for the plaintiffs come in the character of execution creditors, and have thereby acquired, by means of their executions at law, what this court regards as a legal preference, or lien on the property so placed in trust;' and 'admitting that the plaintiffs had acquired, by their executions at law, a legal preference to the assistance of this court (and none but execution creditors at law are entitled to that assistance), that preference ought not, in justice, to be taken away. Though it be the favorite policy of this court to distribute assets equally among creditors, pari passu, yet, whenever a judicial preference has been established by the superior legal diligence of any creditor, that preference is always preserved in the distribution of assets by this court.' The decision in that case was made, giving the priority to the execution creditors who filed the bill, when, otherwise, by virtue of an assignment by the debtor who was insolvent, the proceeds of the equitable interest sought to be subjected would have been distributed ratably among all creditors."

Furthermore, Jenkins did not offer to contribute its fair share of the costs and expenses incurred by plaintiff in prosecuting the proceeding and establishing the wrongful diversion of profits from Beckett. Ordinary fairness and well settled principles of equity require that it should have done so.

What the court said in Edmeston v. Lyde, 1 Paige (N.Y.) 637-640, 19 Am.Dec. 454, quoted with approval by the Supreme Court in Freedman's Savings & Trust Co. v. Earle, supra, is apposite:

"And it would 'seem unjust that the creditor who has sustained all the risk and expense of bringing his suit to a successful termination, should in the end be obliged to divide the avails thereof with those who have slept upon their rights, or who have intentionally kept back that they might profit by his exertions when there could no longer be any risk in becoming parties to the suit.'"

Affirmed.